**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| TEHUM CARE SERVICES, INC.[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 23-90086 (CML) |
| | ) | |
| | ) | |
| | ) | |
| MATTHEW J. DUNDON, solely in his capacity | ) | |
| as the GUC TRUSTEE of the GUC TRUST, | ) | |
| MICHAEL ZIMMERMAN, solely in his | ) | Adv. Pro. No. 26-_____ (CML) |
| capacity as the PI/WD TRUSTEE of the PI/WD | ) | |
| TRUST, and THE POST-EFFECTIVE DATE | ) | Demand for Jury Trial |
| DEBTOR. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YITZCHAK LEFKOWITZ a/k/a ISAAC | ) | |
| LEFKOWITZ, YESCARE CORP., CHS TX, | ) | |
| INC., GENEVA CONSULTING, LLC, | ) | |
| PERIGROVE, LLC, PERIGROVE 1018, LLC, | ) | |
| M2 HOLDCO, LLC, M2 LOANCO, LLC, | ) | |
| PHARMACORR LLC, SARA ANN | ) | |
| TIRSCHWELL, AYODEJI OLAWALE | ) | |
| LADELE, BEVERLY MICHELLE RICE, | ) | |
| JEFFREY SCOTT KING, JENNIFER LYNNE | ) | |
| FINGER, and FRANK JEFFREY SHOLEY, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Matthew J. Dundon, solely in his capacity as GUC Trustee of the GUC Trust, a

Trust formed pursuant to the *First Modified Joint Chapter 11 Plan of Reorganization of the Tort*

*Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor* (Bankr. Dkt.

---

[1] The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is:  205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

No. 2014 at Ex. B) (the "<u>Plan</u>")[2] confirmed by the Bankruptcy Court on March 3, 2025, plaintiff Michael Zimmerman, solely in his capacity as PI/WD Trustee of the PI/WD Trust, a Trust formed pursuant to the Plan, and the Post-Effective Date Debtor[3] (together with the GUC Trust, and the PI/WD Trust, the "<u>Plaintiffs</u>"), by and through their undersigned counsel, for their Complaint against defendants Yitzchak Lefkowitz *a/k/a* Isaac Lefkowitz ("<u>Lefkowitz</u>"), YesCare Corp. ("<u>YesCare</u>"), CHS TX, Inc. ("<u>CHS TX</u>"), each of YesCare's subsidiaries (collectively, the "<u>CHS Entities</u>"), Perigrove, LLC ("<u>Perigrove</u>"), Perigrove 1018, LLC ("<u>Perigrove 1018</u>"), Geneva Consulting, LLC ("<u>Geneva</u>"), M2 HoldCo, LLC ("<u>M2 HoldCo</u>"), M2 LoanCo, LLC ("<u>M2 LoanCo</u>"), PharmaCorr LLC ("<u>PharmaCorr</u>," and collectively with YesCare, CHS TX, the CHS Entities, Perigrove, Perigrove 1018, Geneva, M2 HoldCo, M2 LoanCo, and PharmaCorr, the "<u>Lefkowitz Entities</u>"), Sara Ann Tirschwell ("<u>Tirschwell</u>"), Ayodeji Olawale Ladele ("<u>Ladele</u>"), Beverly Michelle Rice ("<u>Rice</u>"), Jeffrey Scott King ("<u>King</u>"), Jennifer Lynne Finger ("<u>Finger</u>"), Frank Jeffrey Sholey ("<u>Sholey</u>," and, collectively, with Lefkowitz, Tirschwell, Ladele, Rice, King, and Finger, "<u>Corizon Management</u>"), and Does 1-50, collectively, the "<u>Defendants</u>," allege as follows:

<strong><u>NATURE OF ACTION</u></strong>

1.      The Plaintiffs bring this action, *inter alia*, due to the fraudulent conduct of various Defendants against Tehum Care Services, Inc. ("<u>Tehum</u>").  The Plaintiffs' purpose in pursuing that recovery is to hold the Defendants responsible for their wrongdoing and maximize recoveries

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan. While the Plaintiffs assume the Court's familiarity with the events before the Bankruptcy Court set forth herein, the Plaintiffs will review various of such background facts for context.

[3]   The Plan and the Confirmation Order assign the Retained Causes of Action to the Trusts.  However, in an abundance of caution, and only to the extent that a Court determines any Estate Causes of Action asserted herein were not assigned to the Trusts, Mr. Dundon files this Complaint in his capacity as the Wind-Down Officer for the Post-Effective Date Debtor.

2

in order to make distributions to claimants who elected to have their claims assumed and resolved by the Trusts.[4]  Because the Settlement Parties (as defined in the Plan) failed to comply with their payment obligations under the $50 million "Estate Party Settlement" embedded in the Plan (the "Settlement"), the Trusts now prosecute the Estate Causes of Action assigned to, and vested in, them under the Plan so the beneficiaries of the Trusts can receive a meaningful distribution on account of their claims.  The Estate Causes of Action include, without limitation, fraudulent transfer claims, claims for breach of fiduciary duty, and claims based on theories of liability, including, without limitation, alter ego, veil piercing, and successor liability, all of which are being asserted by the Trusts on behalf of, and for the benefit of, the Trusts' beneficiaries.

2.        The Debtor, formerly known as Corizon Health, Inc. ("Corizon"), was itself and through subsidiaries a contracted outsourced provider of healthcare to persons incarcerated in state and county correctional and detention facilities nationwide.  In 2022, certain of the Defendants caused Corizon to undergo a divisional merger under Texas law (the "Divisional Merger"), the gravamen of which was to transfer substantially all assets of value directly or indirectly to certain newly-formed entities.  As part of that transaction, those newly-formed CHS Entities assumed only a limited and specified part of Corizon's existing liabilities, leaving Corizon, which was renamed "Tehum" in the process, with all other liabilities and no ability to satisfy them.

3.        The Settlement described above provided for monthly payments over a period of thirty months.  After making several payments following confirmation, the Settlement Parties failed to make the settlement payment due on February 17, 2026, and failed to cure that default within the period specified in the Plan.  On account of that default, the Channeling Injunction has

---

[4]   Tehum commenced a chapter 11 proceeding in this Court in 2023.  "Corizon" will hereinafter refer to the Debtor before the Divisional Merger, while "Tehum" will hereinafter refer to the Debtor after the Divisional Merger, and "Debtor" will refer to both.

terminated, and all Statutes of Limitations for the Retained Causes of Action against the Released Parties held by the Trusts was extended to June 3, 2026.  The Plaintiffs are timely filing this action to ensure that a recovery is obtained for distribution to the victims of the Defendants' misconduct.

4.      The claims and injuries addressed by the Settlement were extensive.  They included (a) injuries arising from the embezzlement of many tens of millions of dollars from Corizon, the diversion of lucrative contracts, and other breaches of fiduciary duty and egregious wrongs against Corizon before the Divisional Merger, (b) claims and injuries arising out of the fraudulent Divisional Merger itself to the extent that it transferred, for no or insufficient consideration and/or in a deliberate attempt to frustrate Corizon's creditors, valuable assets of Corizon to certain Defendants, while leaving Corizon insolvent, and (c) physical and psychological injuries, including wrongful death, suffered by patients under Corizon's care due to medical malpractice and other bad acts and omissions, some of which had been settled or reduced to judgment for substantial amounts which went unpaid as a result of the Divisional Merger and the subsequent Chapter 11 Case.  The Plaintiffs' causes of action asserted herein include all wrongs suffered by the Debtor, and all Estate Causes of Action that the Plaintiffs are entitled to assert under the Plan.

5.      While divisional mergers are provided for by Texas law, the Divisional Merger here was a sham and was used to perpetrate a fraudulent scheme.  Where, as here, the supposed "fairness" of the Divisional Merger was premised on false information, the transferor was rendered insolvent by the transaction, and the Divisional Merger had the intentional purpose of frustrating the collection of valid debts, the transaction should be avoided as a fraudulent transfer.  Moreover, a transaction based in fraud involving the transfer of significant assets for the purpose of frustrating creditors is a fraudulent transfer regardless of the statutory mechanism by which it is achieved. That distinction is especially important in connection with the Divisional Merger that is challenged

4

here because Mr. Lefkowitz and other Defendants actively deceived the financial advisors retained to offer a "fairness opinion" on the transaction, including providing a forged bank statement for their review.  Without this forgery, a fairness opinion would never have been issued.

6.      The Plan confirmed by this Court offered the Settlement Parties a narrow path to redemption and offered them, and the Released Parties (including the Defendants among the Released Parties), a release consistent in scope with the notice that they elected to provide to known claimants.  The Plan, however, does not offer the Released Parties protection if the Settlement Parties fail to satisfy their payment obligations.  The Plan also empowers the Trust to prosecute the Retained Causes of Action following an event of default.

7.      The terms of the Settlement reflected a delicate balance relating to tort claimants. In order to preserve tort claimants' right to a jury trial, the TCC insisted that any "opt out" who did not want to participate in the settlement be afforded the right to return to the civil justice system.  The Settlement Parties, however, would not fund a settlement unless a high percentage of the tort claimants elected to participate and provide releases.  The Plan resolved this conflict by providing that "opt outs" could continue litigation (*see* Plan at Art. III.F.5 & Art. IX.K) and the Settlement Parties could walk away if more than 5% of the number of Voting PI/WD Claimants elected to opt out of the Consensual Claimant Release (*see* Plan at Art. IV.B.5).

8.      Another delicate balance reflected in the Plan involved the payment terms.  The TCC and the UCC preferred for the Settlement Parties to fund the full amount of the settlement— *i.e.*, $50 million—on the Effective Date.  The concern was obvious given the Settlement Parties' role in the prepetition transactions, which raised the possibility that they would engage in similar fraudulent conduct in the future.  The Settlement Parties would not agree to a lump-sum payment and demanded the ability to pay the settlement amount over 30 months.

9. The Plan resolved this conflict as well. The Settlement Parties were afforded the right to pay over 30 months (*see* Plan at Art. IV.B.1), subject to certain negotiated consequences if they failed to make the payments. Under the Plan, the DIP Loan is deemed fully and forever discharged and released on the Effective Date. *See* Plan at Art. II.C. But the releases provided under Article IV.B.7 (Consensual Claimant Release) and Article IV.B.9 (Estate Causes of Action Release) do not go into effect unless and until the "Final Payment Date."

10. Thus, the Released Parties could not benefit from either release unless the settlement payments were made in accordance with the Plan. Further, under the Plan, the Estate Causes of Action against the Released Parties were transferred to the Trusts and can be prosecuted by the Trusts. Various stakeholders designed these plan provisions to fund distributions to claimants while preventing the Settlement Parties from shirking their funding obligations after the Effective Date and ensuring that they would face consequences for doing so. These stakeholders anticipated that the Settlement's completion would provide claimants with adequate compensation and closure.

11. Unfortunately, the Settlement Parties became delinquent in their payment obligations in late 2025, and, after being offered the opportunity to cure their defaults, failed to make the required payment due in February 2026. As a result, the Plaintiffs must pursue the Estate Causes of Action against certain Released Parties to secure the funds required to make distributions to beneficiaries under the Plan. By this Complaint, the Trusts are now proceeding with such litigation to enable claimants to recover the amounts owed to them.

12. As set forth in the Court-approved Disclosure Statement, the Debtor's directors and officers repeatedly breached their fiduciary duties by looting the company's coffers, diverting funds and future revenue to affiliated entities and orchestrating a related fraudulent divisional

merger. *See* Bankr. Dkt. No. 1815-2 at § II.D. This conduct gives rise to a host of Estate Causes of Action, as described in the Disclosure Statement and outlined herein. *Id.* at § III.A.9.

13. For years, Corizon contracted with state and local governments to provide healthcare services to incarcerated populations. Those fixed-price contracts are typically awarded to providers willing to provide services at the least expense to the contracting entity. Corizon, which served merely as an instrumentality of its owners, failed to provide the required level of services to inmates. Rather, the aim was to extract profits for Corizon's beneficial owners, including Mr. Lefkowitz, who oversaw every aspect of Corizon's operations and finances.

14. This approach to healthcare, particularly with respect to incarcerated populations who have no ability to seek alternative care given their confined status, led to disastrous results, including grievous injuries and wrongful death. Corizon also failed to pay various hospitals and commercial creditors, leaving a trail of carnage in its wake.

15. From virtually the second they took control of Corizon, the Defendants began siphoning funds from the company for their own use and benefit. These efforts ranged from the elaborate, such as causing Corizon to enter into contracts with companies they controlled to perform work that did not exist or was being billed at exorbitant rates, to basic, outright theft, such as directing company accounting personnel to transfer company funds to accounts controlled by Mr. Lefkowitz and his business partners and subsequently removing the funds.

16. At the same time, in the face of over $185 million in mounting liabilities and exposure to tort judgments, Corizon's directors and officers and its beneficial owners elected to engage in blatant fraud to try to insulate their financial exposure. With the help of advisors, they pushed new contracts to newly formed YesCare subsidiaries and, through a divisional merger, allocated substantially all current contracts to CHS TX, which became a YesCare subsidiary.

17.     The facts here support fraudulent transfer claims, claims for breach of fiduciary duty (including corporate theft), claims for aiding and abetting, and claims based on the doctrines of successor liability, alter ego, and veil-piercing.   Defendant Lefkowitz was the lead actor, controlling Corizon and then Tehum and all relevant entities and using them without regard for corporate formalities to shift cash out to other entities he controls.

18.     The Plaintiffs are now empowered under the Plan and the Confirmation Order to commence this litigation and to prosecute the Estate Causes of Action against Mr. Lefkowitz and the entities he controls, to ensure that the claimants receive the compensation to which they are entitled.   The Plan and the Confirmation Order accord the Plaintiffs with claims, rights, and remedies necessary to achieve that result.   Given the Settlement Parties' default, the Plaintiffs are entitled to seek a full recovery, which exceeds any amounts that remain owing under the Plan settlement.

## JURISDICTION AND VENUE

19.     Under the Confirmation Order, this Bankruptcy Court retained exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including those matters set forth in Article XII of the Plan.   Article XII.A. of the Plan provides, *inter alia*, that "the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code for, among other things, including jurisdiction to," *inter alia*:  (a) "resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, implementation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under all settlements (including the Estate Party Settlement),

8

agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order"; and (b) "hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Case[.]"  The Plan, together with 11 U.S.C. §§ 105(a) and 1142, 28 U.S.C. §§ 157(b) and 1334, and Federal Rule of Bankruptcy Procedure 7001(i), confer this Court with subject matter jurisdiction over this matter, which asserts causes of action for breach of obligations under the Plan, recovery of fraudulent transfers, and breaches of fiduciary duty.

20.     This Court has personal jurisdiction over Defendants pursuant to, *inter alia*, 11 U.S.C. § 157(b), 28 U.S.C. § 1334, and Federal Rule of Bankruptcy Procedure 7004, including by virtue of their citizenship in the United States and/or continuous and systematic contacts with the United States and/or this District and/or purposeful direction of activities toward the United States and/or this District, including acts giving rise to the claims asserted herein, as detailed in this Complaint.  Venue properly lies in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

21.     Certain Causes of Action brought herein arise under the laws of the United States. *See* 28 U.S.C. § 1331.  Other Causes of Action brought herein are related to Causes of Action brought under the laws of the United States and form part of the same case or controversy under Article III of the United States Constitution.  *See* 28 U.S.C. § 1367(a).  Because this adversary proceeding is a "proceeding[] arising under Title 11 or arising in or related to a case under Title 11 of the United States Code," it is "automatically referred to [this Court]." *See* District Court General Order 2012-6, dated May 24, 2012 ("Referral Order"), at ¶ 1.

22.     In the event, *arguendo*, it is "determine[d] that entry of a final order or judgment by [this Court] would not be consistent with Article III of the United States Constitution" and it is determined that this adversary proceeding is "a core matter," then this Court "shall, unless

9

otherwise ordered by the District Court, hear the proceeding and submit proposed findings of fact and conclusions of law to the District Court." Referral Order at ¶ 4. The District Court also may treat any order of this Court as proposed findings of fact and conclusions of law if the District Court concludes that this Court could not have entered a final order or judgment consistent with Article III of the United States Constitution." *Id*. The Plaintiffs consent to the entry of final orders or a final judgment by this Court in this adversary proceeding.

## PARTIES

23.     Plaintiff Dundon is the GUC Trustee of the GUC Trust, a Delaware statutory trust. The GUC Trust is one of the Trusts formed on the Effective Date of the Plan, and is the Debtor's estate representative pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code with respect to any transfers on the Effective Date pertaining to the GUC Trust Assets, including the Retained Causes of Action.

24.     Plaintiff Zimmerman is PI/WD Trustee of the PI/WD Trust, a Delaware statutory trust. The PI/WD Trust is one of the Trusts formed on the Effective Date of the Plan, and is the Debtor's estate representative pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code with respect to any transfers on the Effective Date pertaining to the PI/WD Trust Assets, including the Retained Causes of Action.

25.     Plaintiff Dundon is the Wind-Down Officer of the Post-Effective Date Debtor. The Plan and the Confirmation Order assign the Retained Causes of Action to the Trusts. However, in an abundance of caution, and only to the extent that a Court determines any Estate Causes of Action asserted herein were not assigned to the Trusts, Mr. Dundon files this Complaint in his capacity as the Wind-Down Officer for the Post-Effective Date Debtor.

26.     Defendant Yitzchak Lefkowitz a/k/a Isaac Lefkowitz is the sole director of Tehum Care Services, Inc., a former director of Corizon, a director of YesCare, a member of Perigrove, a

member of Perigrove 1018, a director of M2 HoldCo, a director of M2 LoanCo, and oversaw every aspect of Corizon's operations.  Mr. Lefkowitz is a "Released Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.  Mr. Lefkowitz has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, (a) his role in orchestrating the May 2022 Divisional Merger under the Texas Business Organizations Code (as further described herein, the "Divisional Merger"), which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein, (b) appearing in person in Houston, Texas, to offer testimony in connection with the Chapter 11 Case, (c) his role in negotiating the Estate Party Settlement, and (d) his role in negotiating the Cure Agreement dated February 2, 2026 (*see* Bankr. Dkt. No. 2602 at Ex. A) (the "Cure Agreement").  Mr. Lefkowitz maintains a personal residence in Brooklyn, New York, and an office at 885 Third Avenue, New York, New York.

27.     Defendant YesCare Corp. is a Texas corporation and was formed on January 31, 2022, when it filed a *Certificate of Formation For-Profit Corporation* dated January 26, 2022, with the Texas Secretary of State.  On the date of its formation, YesCare identified its business address as 3411 Yoakum Blvd. #2901, Houston, Texas 77006.  YesCare is a "Released Party" and a "Settlement Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.  YesCare has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, (a) its role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein, (b) its role in negotiating the Estate Party Settlement, and (c) its role in negotiating the Cure Agreement.  By executing the Cure Agreement, YesCare expressly consented to the jurisdiction and venue before this Court in the event litigation arises

11

between the Trustees and YesCare in connection with the Cure Agreement.  YesCare's principal place of business today is 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

28.     Defendant CHS TX, Inc., is a Texas corporation and was formed on May 4, 2022, when Corizon filed a *Certificate of Merger Domestic Entity Divisional Merger Business Organization Code* with the Texas Secretary of State.  Sara Tirschwell was one of CHS TX's initial directors and maintained a business address at 3411 Yoakum Blvd. #2901, Houston, Texas 77006 on the date CHS TX was formed.  CHS TX is a "Released Party" and a "Settlement Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.  CHS TX has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, (a) its formation under the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein, (b) its role in negotiating the Estate Party Settlement, and (c) its role in negotiating the Cure Agreement.  By executing the Cure Agreement, CHS TX expressly consented to the jurisdiction and venue before this Court in the event litigation arises between the Trustees and CHS TX in connection with the Cure Agreement.  CHS TX's principal place of business today is 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

29.     Defendant Geneva Consulting, LLC, is a Delaware limited liability company and has its principal place of business at 7 World Trade Center, 46th Floor, New York, NY 10007.  Geneva is a "Released Party" and a "Settlement Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.  Geneva has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, (a) providing management services to Corizon and/or YesCare between February 2022 and May 2022, (b) its role in negotiating the Estate Party

Settlement, and (c) its role in negotiating the Cure Agreement. By executing the Cure Agreement, Geneva expressly consented to the jurisdiction and venue before this Court in the event litigation arises between the Trustees and Geneva in connection with the Cure Agreement.

30.     Defendant Perigrove, LLC, is a New York limited liability company and has its principal place of business at 885 Third Avenue, 29th Floor, New York, NY 10022. Isaac Lefkowitz is an investor in Perigove, LLC. Perigrove is a "Released Party" and a "Settlement Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas on March 3, 2025. Perigrove has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, (a) its role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein, (b) its role in negotiating the Estate Party Settlement, and (c) its role in negotiating the Cure Agreement. By executing the Cure Agreement, Perigrove expressly consented to the jurisdiction and venue before this Court in the event litigation arises between the Trustees and Perigrove in connection with the Cure Agreement.

31.     Defendant Perigrove 1018, LLC, is a New York limited liability company and has its principal place of business at 351 Spook Rock Road, Suffern, NY 10901. Isaac Lefkowitz is an investor in Perigrove 1018, LLC. Perigrove 1018 is a "Released Party" and a "Settlement Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025. Perigrove 1018 has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, (a) its role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein, (b) its role in negotiating the Estate Party Settlement, and (c) its role in negotiating the Cure Agreement. By executing the Cure Agreement, Perigrove 1018

expressly consented to the jurisdiction and venue before this Court in the event litigation arises between the Trustees and Perigrove 1018 in connection with the Cure Agreement.

32.     Defendant M2 HoldCo, LLC is a Florida limited liability company and has its principal place of business at 666 NE 125th Street, Suite 212, North Miami, FL 33161.  M2 HoldCo, LLC is a wholly owned subsidiary of Perigrove 1018.  M2 HoldCo is a "Released Party" and a "Settlement Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.  M2 HoldCo has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, (a) its role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein, (b) its role in overseeing M2 LoanCo's role as the lender and administrative agent under the Debtor's loan facility in the Chapter 11 Case, (c) its role in negotiating the Estate Party Settlement, and (d) its role in negotiating the Cure Agreement.  By executing the Cure Agreement, M2 HoldCo expressly consented to the jurisdiction and venue before this Court in the event litigation arises between the Trustees and M2 HoldCo in connection with the Cure Agreement.

33.     Defendant M2 LoanCo, LLC is a Florida limited liability company and has its principal place of business at 666 NE 125th Street, Suite 212, North Miami, FL 33161.  M2 LoanCo is a wholly owned subsidiary of M2 HoldCo.  M2 LoanCo is a "Released Party" and a "Settlement Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.  M2 LoanCo has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, (a) its role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein, (b) functioning as the lender and

14

administrative agent under the Debtor's loan facility in the Chapter 11 Case, (c) its role in negotiating the Estate Party Settlement, and (d) its role in negotiating the Cure Agreement.  By executing the Cure Agreement, M2 LoanCo expressly consented to the jurisdiction and venue before this Court in the event litigation arises between the Trustees and M2 LoanCo in connection with the Cure Agreement.

34.     Defendant PharmaCorr, LLC is a Delaware limited liability company and has its principal place of business at 7400 Plaza Mayor Boulevard, Suite 100, Oklahoma City, OK 73149. PharmaCorr is a "Released Party" and a "Settlement Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.  PharmaCorr has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, (a) its role in negotiating the Estate Party Settlement, and (c) its role in negotiating the Cure Agreement.  By executing the Cure Agreement, PharmaCorr expressly consented to the jurisdiction and venue before this Court in the event litigation arises between the Trustees and PharmaCorr in connection with the Cure Agreement.

35.     Defendant Sara Ann Tirschwell is a former Chief Executive Officer for Corizon (December 2021 to May 2022) and a former Chief Executive Officer of YesCare (May 2022 to February 2023).  At all relevant times, Ms. Tirschwell resided at 3411 Yoakum Blvd. #2901, Houston, Texas 77006.  Ms. Tirschwell is a "Released Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas on March 3, 2025.  Ms. Tirschwell was the Chief Executive Officer for Corizon on the date of the Divisional Merger, at which time Corizon was a Texas Corporation.  Ms. Tirschwell has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, her role in orchestrating the Divisional Merger, which merger forms a basis for, *inter*

*alia*, certain of the Causes of Action asserted herein. Upon information and belief, Ms. Tirschwell currently maintains an office at 800 Westchester Avenue, Suite S-520, Rye Brook, New York 10573.

36. Defendant Ayodeji Olawale Ladele is a former Executive Vice President and Chief Medical Officer for Corizon and YesCare. Mr. Ladele is a "Released Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025. Mr. Ladele was the Executive Vice President and Chief Medical Officer for Corizon on the date of the Divisional Merger, at which time Corizon was a Texas Corporation. Mr. Ladele has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, his role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein. Upon information and belief, Mr. Ladele resides in Panama City Beach, Florida, and regularly transacts business, including with and at the direction of Mr. Lefkowitz, in this District.

37. Defendant Beverly Michelle Rice is a former Corporate Controller for Corizon and the current Corporate Controller for YesCare. Ms. Rice is a "Released Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025. Ms. Rice was the Corporate Controller for Corizon on the date of the Divisional Merger, at which time Corizon was a Texas Corporation. Ms. Rice has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, her role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein. Upon information and belief, Ms. Rice resides in Nashville, Tennessee, and regularly transacts business, including with and at the direction of Mr. Lefkowitz, in this District.

38.     Defendant Jeffrey Scott King is a former Chief Legal Officer at Corizon and current Executive Vice President and Chief Legal Officer at YesCare.  Mr. King is a "Released Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.  Mr. King was the Chief Legal Officer for Corizon on the date of the Divisional Merger, at which time Corizon was a Texas Corporation.  Mr. King has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, his role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein.  Upon information and belief, Mr. King resides in Brentwood, Tennessee, and regularly transacts business, including with and at the direction of Mr. Lefkowitz, in this District.

39.     Defendant Jennifer Lynne Finger is a former Assistant General Counsel at Corizon and current Assistant General Counsel at YesCare.  Ms. Finger is a "Released Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.  Ms. Finger was the Assistant General Counsel for Corizon on the date of the Divisional Merger, at which time Corizon was a Texas Corporation.  Ms. Finger has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, her role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein.  Upon information and belief, Ms. Finger resides in Brentwood, Tennessee, and regularly transacts business, including with and at the direction of Mr. Lefkowitz, in this District.

40.     Defendant Frank Jeffrey Sholey is a former Chief Financial Officer at Corizon and current Chief Executive Officer at YesCare.  Mr. Sholely is a "Released Party" under the Plan confirmed by the Confirmation Order entered by this Court in Houston, Texas, on March 3, 2025.

Mr. Sholey was the Chief Financial Officer for Corizon on the date of the Divisional Merger, at which time Corizon was a Texas Corporation. Mr. Sholey has maintained continuous and systematic contacts with Texas for the purposeful direction of activities in Texas, including, without limitation, his role in orchestrating the Divisional Merger, which merger forms a basis for, *inter alia*, certain of the Causes of Action asserted herein. Mr. Sholey assumed the role of Chief Executive Officer of YesCare in February of 2023 upon Ms. Tirschwell's departure. Upon information and belief, Mr. Sholey resides in Brentwood, Tennessee, and regularly transacts business, including with and at the direction of Mr. Lefkowitz, in this District.

41. Defendants Does 1-50 are persons who may have been transferred any assets of any of the named Defendants, including but not limited to their business opportunities in relation to continued or new healthcare services.

## FACTUAL ALLEGATIONS

### I. Corizon Health

42. Corizon was a nationwide provider of correctional healthcare, serving multiple states. In the ordinary course of business, Corizon entered into agreements with various (typically governmental) entities under which Corizon would provide, or arrange for the provision of, healthcare services to certain inmates or detainees of the contract counterparty.

43. For most of its history, until the mid-2010s, Corizon's business was financially successful. Near the end of the decade, however, the company began to witness the loss of key contracts and mounting liabilities, largely driven by claims asserted by incarcerated individuals alleging mistreatment or inadequate healthcare.

44. In June 2020, the Flacks Group, a global investor in special situations headquartered in Miami, Florida, acquired Corizon's operations and its existing debt. The Flacks Group viewed Corizon's pharmacy subsidiary, PharmaCorr, LLC, as a potentially profitable

18

standalone business.  The Flacks Group began effectuating a series of transactions to split off and sell PharmaCorr.

45.     In late November and early December 2021, members of the Flacks Group were introduced to Isaac Lefkowitz and other investors as potential buyers for PharmaCorr.  After a week of negotiations, Mr. Lefkowitz and the other investors in Perigrove 1018, LLC, acquired the entire portfolio of companies from the Flacks Group.

46.     As of December 7, 2021, Perigrove 1018[5] owned or controlled Corizon and its affiliates, including (a) M2 HoldCo, LLC, which itself owned M2 EquityCo, LLC and M2 LoanCo, LLC, (b) Valitás Intermediate Holdings, Inc., which itself owned Valitás Health Services, Inc., Corizon Health, Inc., Corizon Health of New Jersey, LLC, and Corizon, LLC, and (c) M2/PharmaCorr Holdings, LLC, which owned PharmaCorr.

## II.     Corizon Was a Mere Instrumentality

47.     Corizon and its affiliates were structured as a group of affiliated entities, tied together through related-party loans and contracts.  Perigrove 1018 and Mr. Lefkowitz operated Corizon as a mere instrumentality, extracting substantial value for themselves while providing inadequate healthcare to inmates and failing to pay third parties.

48.     Perigrove 1018 and Mr. Lefkowitz operated Corizon in a manner that disregarded its separateness, caused Corizon to enter into agreements with related parties that were not arm's length transactions, failed to observe corporate formalities, co-mingled assets, including bank accounts, failed to maintain business records, and utilized corporate funds for personal purposes. Various mechanisms were used to extract funds.

---

[5]     Upon information and belief, Perigrove and Perigrove 1018 are alter egos of each other and do not have a separate existence.  From this point forward, all factual allegations and requests for relief in this Complaint regarding Perigrove 1018 apply equally to Perigrove.

A.      **Consulting Agreement with Geneva Consulting, LLC**

49.      One such mechanism was a Consulting Agreement with Geneva Consulting, LLC ("Geneva").  Geneva and Perigrove 1018 share common directors and authorized representatives, including Mr. Lefkowitz.

50.      In December 2021, Corizon's immediate parent company, Valitás Health Services, Inc. ("Valitás Health"), entered into a Consulting Agreement with Geneva Consulting, LLC ("Geneva").  Mr. Lefkowitz signed the Consulting Agreement as the "Interim CEO" for Valitás.

51.      Mr. Lefkowitz directed James Hyman, the then-CEO of Corizon, and Jeff Sholey, the then-CFO of Corizon, to transfer substantial sums to Geneva under the Consulting Agreement.

52.      On December 8, 2021, Corizon transferred $3 million to Geneva, purportedly as a retainer required under the Consulting Agreement.  Corizon then transferred $500,000 per month for the subsequent five (5) months, purportedly for "Corporate Restructuring" services under the Consulting Agreement.  In all, Corizon transferred $5.5 million to Geneva:

| 12/9/2021 | $3,000,000.00 |
| 1/11/2022 | $500,000.00 |
| 2/7/2022 | $500,000.00 |
| 3/1/2022 | $500,000.00 |
| 4/1/2022 | $500,000.00 |
| 5/2/2022 | $500,000.00 |
| **Total to Geneva** | **$5,500,000.00** |

53.      Mr. Lefkowitz, as corporate representative for Geneva admitted that Geneva could not identify any services, consulting or otherwise, Geneva provided to Corizon.  The transfers to Geneva were in exchange for no value whatsoever.

B.      **Signature Account / Transfers to M2 LoanCo**

54.      Another such mechanism to siphon funds were company bank accounts at Signature Bank (the "Signature Accounts"), which included an operating account in the name of Corizon

20

LLC (the "Corizon Signature Account"). In December 2021, Mr. Lefkowitz and his business partners opened bank accounts at Signature Bank purportedly in the name of Corizon and that subsidiary. Corizon's other bank accounts were at Bank of America.

55. Perigrove 1018's members were the sole signers on the Signature Accounts. Corizon's CFO and existing management did not have access to them.

56. Between December 2021 and November 2022, Perigrove 1018 and Mr. Lefkowitz siphoned $24.5 million out of Corizon by transferring funds from Corizon's Bank of America accounts to the Signature Accounts, and then to M2 LoanCo:

| 12/29/2021 | $10,000,000.00 |
|---|---|
| 12/30/2021 | $5,000,000.00 |
| 1/4/2022 | $2,300,000.00 |
| 1/5/2022 | $600,000.00 |
| 1/31/2022 | $5,000,000.00 |
| 2/18/2022 | $600,000.00 |
| 3/8/2022 | $10,000,000.00 |
| 3/9/2022 | ($10,000,000.00) |
| 5/17/2022 | $1,000,000.00 |
| 11/14/2022 | $25,572.19 |
| 11/14/2022 | $12,583.00 |
| **Total to M2 LoanCo** | **$24,538,155.19** |

57. At all relevant times, M2 LoanCo had two directors: Mr. Lefkowitz and Alan Rubenstein. M2 LoanCo had no employees and did not maintain e-mail records on its own server. Upon information and belief, after the foregoing funds were transferred to the Signature Accounts, they were then funneled to Perigrove.

**C.** **Other Perigrove 1018 and Lefkowitz-Related Parties**

58. In addition to the $30 million identified above, Corizon made additional payments totaling approximately $956,700 paid to Amerisource Bergen—a third-party vendor—to satisfy PharmaCorr's obligations:

21

| 1/31/2022 | $500,000.00 |
|---|---|
| 2/15/2022 | $456,707.08 |
| **Total to Amerisource Bergen** | **$956,707.08** |

59.      Upon information and belief, Perigrove 1018 and Mr. Lefkowitz commingled with the funds and assets of Corizon and the other entities in its organization structure in a manner that disregarded corporate separateness and permitted Perigrove 1018 and Mr. Lefkowitz to treat Corizon's bank accounts and revenue stream as personal assets.

60.      Upon information and belief, Perigrove 1018 and Mr. Lefkowitz diverted Corizon's funds and assets to enrich themselves at the expense of Corizon's operations.  And, upon information and belief, because of Perigrove 1018's and Mr. Lefkowitz's abuse of the corporate form, Corizon was undercapitalized such that it provided substandard healthcare and was unable to cover its exposure to tort claims.

**III.    Personal Injury and Wrongful Death Claims**

61.      Despite bidding on and agreeing to contracts with several states and counties to provide healthcare to incarcerated individuals, Corizon failed to provide the level of care that it promised.  This resulted in claims being asserted by incarcerated individuals alleging mistreatment or inadequate healthcare and, in many cases, their family members following the deaths of such individuals.  The following cases are offered for illustrative purposes only to show examples of the damage suffered by these individuals.

**A.    Daniel Allard**

62.      Daniel Allard's grandmother—Aanda Slocum—filed a wrongful death case against Corizon in the Arizona District Court, *Estate of Daniel Allard v. Corizon Health LLC*, Case 4:18-cv-00044-JCH.  Mr. Allard had about one year left of a 2½ year sentence in an Arizona prison for attempted trafficking of stolen property.

22

63.     Mr. Allard was found by a prison employee lying in brown vomit.  He was taken to Corizon's prison medical facility with bleeding from his head and nose.

64.     Despite clear signs of a traumatic head injury from a likely assault and deteriorating symptoms, Corizon personnel did not call for emergency medical help for over two hours.

65.     Ignoring medical advice to fly Mr. Allard immediately to an emergency room, he was driven by ambulance to a Bisbee airport for helicopter transport to a Tucson hospital, where he died three days later.

### B.     David J. Hall

66.     In Maryland, a jury awarded David J. Hall $3 million against Corizon for failing to treat a wrist fracture that had collapsed and required extensive surgery.

67.     Mr. Hall was provided only an Ace bandage and told his injury would "self-heal." The jury's award was reduced to $770,000 under a Maryland statute.

### C.     Rachel Garwood

68.     Rachel Garwood was an incarcerated inmate at the Women's Huron Valley Correction Facility ("WHV"), where Corizon was the primary healthcare provider.  In December of 2018, Ms. Garwood developed a red rash with dry skin and pimple-like spots on the backs of her knees, between her thighs, and between her fingers.  In January of 2019, Ms. Garwood's cellmate tested positive for scabies—microscopic mites that cause significant irritation.

69.     The cellmate was not quarantined, nor was Ms. Garwood reassigned to another cell or similarly tested for scabies.  Ms. Garwood then put in a request to Corizon seeking treatment for her own rash.  This request was ignored.

70.     Between January and February of 2019, Ms. Garwood's rash spread rapidly and tormented her.  The itching was unbearable, and she scratched to the point of bleeding.  During this time, she sent several more requests to Corizon for treatment.  All were ignored.

23

71.     In March of 2019, Ms. Garwood was finally seen by a nurse employed by Corizon, who misdiagnosed her with eczema.  Improperly diagnosed and untreated, Ms. Garwood's scabies developed into a painful boil on her buttocks.  In April 2019, Ms. Garwood sought treatment again.  This was ignored.

72.     Several days later, the boil expanded and popped, allowing green pus to seep out of the open wound.  Within a matter of days, the resulting abscess measured nearly five inches in diameter and caused her excruciating pain.

73.     A WHV guard intervened, and the abscess was removed, leaving permanent scarring.  Ms. Garwood represents the class of WHV litigants who filed personal injury claims against Corizon for its failure to appropriately respond to the outbreak and treat its victims.

**D.     Kohchise Jackson**

74.     In 2019, Kohchise Jackson brought claims against Corizon, asserting that Corizon was deliberately indifferent to his medical needs in violation of the Eighth Amendment.

75.     Specifically, in or around July 2016, while serving as a pre-trial detainee, Mr. Jackson developed a colovesical fistula, or a hole in the tissue that separates the large intestine from the bladder.  This condition resulted in repeated bladder infections, urinary tract infections, high fevers, chills, nausea, vomiting, and pain.

76.     In December 2016, Mr. Jackson underwent a procedure designed to provide temporary relief—*i.e.*, he was outfitted with a colostomy bag.  Following this procedure, however, Corizon denied Mr. Jackson's requests for a colostomy reversal surgery.

77.     This required Mr. Jackson to live with a colostomy bag until his detention concluded nearly three years later, in May 2019.  Mr. Jackson's prolonged dependence on a colostomy bag resulted in negative physical and psychological ramifications, including odor, vomiting, difficulty eating, assaults from other prisoners, anxiety, and stress.

24

78.     In April 2026, following an eight-day trial, a jury awarded Mr. Jackson $7.5 million in non-economic damages and $300 million in punitive damages.

## IV.    Commercial Claims

79.     Corizon also failed to pay commercial creditors, including hospitals.  The following cases are offered for illustrative purposes only to show examples of the damage suffered by these creditors.

### A.    St. Luke's Health System, Ltd.

80.     St. Luke's Health System, Ltd. ("St. Luke's") provided medical services to inmates at Corizon's behest for an agreed-upon rate set forth in a 2011 memorandum of understanding.  In July of 2014, Corizon unilaterally abandoned the fee agreement and refused to pay St. Luke's more than the substantially lower Medicaid rates.

81.     Separately, in 2019, St. Luke's and Corizon entered into a hospital services agreement, under which, starting in 2021, Corizon refused to pay all claims.

82.     St. Luke's alleged that by the time the Debtor filed for bankruptcy, the Debtor owed St. Luke's (i) $14,150,026 in underpayments for services rendered, (ii) an additional $15,354,223 in statutory interest of 1% per month on the underpayments; (iii) $1,595,901.36 in unpaid outstanding claims under the hospital services agreement; and (iv) $204,369.78 in contracted interest on the unpaid claims; an aggregate sum of $31,314,520.14.

### B.    Capital Region Medical Center

83.     Capital Region Medical Center ("Capital Region"), together with the Curators of the University of Missouri ("University of Missouri") and Corizon, entered into a hospital services agreement under which Capital Region would provide health care services to certain correctional facility inmate patients or detainees for whom Corizon was contractually obligated to arrange care.

25

Beginning in January 2020, Corizon refused to pay Capital Region and the University of Missouri the amounts owed under the hospital services agreement.

84.     This continued until November 2021.   Capital Region and the University of Missouri made numerous attempts to secure payment for amounts due, but Corizon refused to pay while concurrently assuring Capital Region of its future intent to pay.

85.     Capital Region expended significant resources attempting to litigate for the monies owed under the hospital service agreement, before its action was stayed.  Capital Region alleged that by the time the Debtor filed for bankruptcy, the Debtor owed Capital Region $23 million in unpaid claims, as well as a 1% contractually agreed-upon monthly interest rate.

## C.     Maxim Healthcare Staffing Services, Inc.

86.     The parent company of Maxim Healthcare Staffing Services, Inc. ("Maxim") and Corizon entered into a master services agreement under which, after assignment, Maxim would supply licensed healthcare providers as supplemental staffing to Corizon upon request.  Beginning in January 2021, Corizon began missing payments.

87.     Throughout 2021 and 2022, Maxim demanded payment on multiple occasions, but, save for a few sporadic exceptions, Corizon failed to pay its delinquent obligations under the master service agreement.  Maxim alleged that by the time the Debtor filed for bankruptcy, the Debtor owed Maxim an aggregate sum of $4,937,284.91.

## D.     Saint Alphonsus Health System, Inc.

88.     Saint Alphonsus Health System, Inc. ("Saint Alphonsus") entered into a service agreement with Corizon under which Saint Alphonsus would provide health care services to inmates brought to it by Corizon for a negotiated rate.

89.     In May of 2014, Corizon abandoned the agreed-upon rate and belligerently refused to pay Saint Alphonsus any amount above the substantially lower Medicaid rate.

26

90.     Beginning in February 2021, Corizon took its belligerence one step further, stopping all payments to Saint Alphonsus altogether.  For eight months, Corizon solicited and secured medical services from Saint Alphonsus for inmates under the service agreement without a single reimbursement.  Saint Alphonsus alleged that by the time the Debtor filed for bankruptcy, the Debtor owed Saint Alphonsus an aggregate sum of $15,097,225.24.

## V.     Project Orange

91.     Despite its profitability during the 2010s, when Perigrove 1018 acquired Corizon in December 2021, it was facing significant financial headwinds, at least in part due to tort and commercial litigation risks arising from cost-minimization strategies.

92.     In December 2021, Mr. Lefkowitz directed Corizon to hire Sara Tirschwell as its Chief Executive Officer.  Sara Tirschwell had prior experience working with companies in distressed situations.  She was a resident of Houston, Texas, and a graduate of Rice University in Houston, Texas.  Seeking to curtail these mounting risks, Corizon and its owners sought to shield their companies from tort litigation while effectively looting the business.

93.     They ultimately decided to implement a restructuring tactic colloquially referred to as the "Texas Two-Step."  This tactic, which has been used in connection with several high-profile bankruptcies, involves a divisional merger under Texas law in which a subsidiary splits its assets and liabilities between two entities.

94.     One entity—"TortCo"—will house all the subsidiary's tort liabilities.  The other entity—"GoodCo"—will be vested with the subsidiary's productive assets and favored liabilities. TortCo will agree to indemnify the entire non-debtor corporate family for the tort liability and then subsequently file for bankruptcy, permitting TortCo to enjoin all tort liability litigation against all non-debtor affiliates and other indemnified parties.  Essentially, the Texas Two-Step is designed

27

to provide the debtor and its non-debtor affiliates with the benefits of bankruptcy without imposing its burdens on operating companies with productive assets.

95.     In late 2021 and early 2022—when Perigrove 1018 and Mr. Lefkowitz were looking to offload Corizon's liabilities—the Texas Two-Step appeared to offer the Defendants an easy bankruptcy solution.

96.     In or around January 2022, Mr. Lefkowitz met with White & Case LLP to advise on and facilitate a two-step process that would enable Perigrove 1018 and Mr. Lefkowitz to retain the value that they were extracting from Corizon and shield future business revenue from Corizon's historical liabilities.  This endeavor was code-named "Project Orange."

97.     On May 1, 2022, White & Case delivered a presentation regarding Project Orange to Corizon, emphasizing that the goals of any transaction would be to (a) minimize the disruption to ongoing business, (b) best position the business to win new contracts, (c) retain and incentivize employees to remain part of the business, and (d) minimize the risk that Corizon would be forced to liquidate.

98.     White & Case's presentation advised Corizon to separate its "current business and related secured and unsecured liabilities" from its "historical liabilities."

99.     Current business and favored liabilities would be vested in a new entity named CHS TX, Inc., while the disfavored historical liabilities, including the tort-based claims, would be retained by Corizon.  CHS TX would then be acquired by a newly formed entity, YesCare.

100.    Under this structure, Corizon would be responsible for managing the disfavored liabilities, while Corizon's existing business and future business opportunities would be funneled to YesCare and its wholly owned subsidiaries.

28

## VI.    Implementing the Fraud

101.    Mr. Lefkowitz and Perigrove 1018 decided to move forward with the proposed transaction, which was designed to hinder, delay, and defraud Corizon's creditors.  They did so by implementing the proposed transactions through fraud.

### A.    The Creation of YesCare

102.    On January 31, 2022, YesCare filed a *Certificate of Formation For-Profit Corporation* dated January 26, 2022, with the Texas Secretary of State.  *See* **Exhibit A**, attached hereto.  This Certification identified Sara Tirschwell, the then-Chief Executive Officer of Corizon, as YesCare's sole director, and 3411 Yoakum Blvd. #2901, Houston, Texas 77006 (a luxury apartment building in Houston's Montrose and Museum District area), as YesCare's business address and Sara Tirschwell's address.

103.    The 2022 *Foreign Profit Corporation Annual Report* for Corizon dated April 19, 2022, identifies the following individuals as officers or directors of Corizon:  Sara Tirschwell (CEO and Director), Jeffrey F. Sholey (CFO), Scott J. King (SEC), Jennifer Finger (Asst. Secretary), Maya Patel (Asst. Secretary), Tracy Bartoli (Asst. Secretary), Ayodeji Ladele, M.D. (CMO), David Gefner (Director, Chairman), Abe Goldberger (Director, Vice Chairman), Isaac Lefkowitz (Director), and Jay Leitner (Director).  *See* **Exhibit B**, attached hereto.  This report further identified Corizon's principal place of business as 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

### B.    Funnel New Business to Newly Formed YesCare Entities

104.    YesCare then formed several operating subsidiaries, including CHS Alabama, LLC, and CHS Arizona, LLC, in the following months.  Each of these entities was a YesCare subsidiary.  Sara Tirschwell, the CEO of Corizon, was listed as the manager for these entities.

105. Corizon executives, including CEO Sara Tirschwell, and CLO Scott King, and others, pitched all new RFPs under the newly formed entities—CHS AL, LLC ("CHS AL") and CHS AZ, LLC ("CHS AZ"). New contracts arising from these efforts resulted in new business being funneled away from Corizon to YesCare.

106. At this time, YesCare had no employees. Corizon executives pitched the CHS entities as being comprised of Corizon clinical and administrative employees.

107. On February 11, 2022, Mr. Lefkowitz sent an email to Ms. Tirschwell, Mr. King, and Mr. Sholey, and indicated that in response to the Arizona RFP the executives should frame CHS AZ as a "wholly owned subsidiary of: YesCare" and a "predominantly woman owned Company comprised of former Corizon clinical and administrative employees" that was "[m]anaged by Geneva Consulting, a wholly owned subsidiary of: Genesis Healthcare a publicly traded Company (GENN)." *See* **Exhibit C**, attached hereto.

108. On March 22, 2022, consistent with Mr. Lefkowitz's directions, CHS AZ submitted a proposal for a contract with the Arizona Department of Corrections, Rehabilitation & Reentry ("ADCRR"). This bid was submitted on YesCare letterhead, but the cover email was sent from "Holly.Rawnsley@corisonhealth.com." *See* **Exhibit D**, attached hereto. CHS AZ described itself as "a YesCare Company" that was formed on February 11, 2022, for the "sole purpose of bidding and providing inmate correctional health care to the inmates in the care of the ADCRR."

109. Corizon executives pitched YesCare and CHS AZ as being comprised of Corizon's clinical and administrative employees and having back-office and administrative support from Geneva Consulting LLC, a wholly owned subsidiary of Genesis Healthcare, Inc.

110. On April 8, 2022, the State of Alabama Department of Corrections ("ADOC") announced that it was accepting proposals from correctional healthcare providers for its

30

correctional facilities.  At this time, ADOC was mired in an eight-year-old federal lawsuit over the medical and mental health care it provided to inmates.  U.S. District Judge Myron Thompson ruled in 2017 that Alabama's mental health care was "horrendously inadequate."

111.   YesCare submitted a proposal to ADOC.  On July 5, 2022, the Alabama Department of Corrections announced that it had selected YesCare, based in Brentwood, Tennessee, over four other proposals from Centurion, Vital Core, Wellpath, and Wexford Health (ADOC's then-current provider).  *See* **Exhibit E**, attached hereto.

112.   The ADOC did not disclose any cost figures, but ADOC Commissioner John Hamm stated that an RFP committee reviewed the five proposals and selected YesCare based on a combination of "quality and overall cost."  The ADOC described the newly formed YesCare as having more than 40 years of correctional health care experience at more than 475 facilities.

113.   On August 8, 2022, the ADOC rescinded the prison health care contract award to YesCare.  The ADOC announced it was reissuing its September request for proposals.  However, on December 2, 2022, ADOC awarded "CHS AL, LLC, d.b.a. YesCare" a contract scheduled to pay $1,064,044,666 from April 1, 2023, through September 30, 2027, and over $235 million incremental increase in annual revenue.  YesCare's final contract with the ADOC, dated February 2023, was signed by Jeffrey Scott King.  *See* **Exhibit F**, attached hereto.

114.   A cloud hung over the ADOC contract.  As reported in the press, one of ADOC's primary private attorneys, Bill Lunsford, had previously held a seat on YesCare's Board of Advisors.  Mr. Lunsford resigned from YesCare's Board of Advisors before new bids were submitted in September of 2022.  However, there was sufficient appearance of impropriety that the ADOC felt the need to redo the process before selecting YesCare.

31

115. Mr. Lefkowitz was at the center of these efforts. Emails and documents show that Mr. Lefkowitz himself registered CHS AL, LLC with the Internal Revenue Service to obtain an employer identification number (EIN). *See* **Exhibit G**, attached hereto.

116. Jeffrey Scott King and other executives made mail forwarding arrangements for the "new state LLCs." *See* **Exhibit H**, attached hereto.

117. On April 6, 2022, Tracy Bartoli, Corizon's Director of Legal Services, sent Jeffrey Scott King, Corizon's Chief Legal Officer, an Excel spreadsheet that identified the newly established CHS entities, such as CHS AZ and CHS AL, as well as several others and planned CHS entities. *See* **Exhibit I** and **Exhibit J**, attached hereto. The spreadsheet identified Sara Tirschwell—Corizon's Chief Executive Officer—as the "Member" and "Manager" of the newly established CHS entities. This activity reflects a concerted, detailed effort by Perigrove 1018, Mr. Lefkowitz, and Corizon's directors and officers to move business opportunities away from Corizon in the lead-up to the divisional merger (discussed below).

118. The CHS AL and CHS AZ entities represent at least two occasions in the months preceding the divisional merger where, when it came time to bid for new contracts, instead of doing so as part of Corizon, Mr. Lefkowitz and the Corizon management team planned to establish entities for each state to shift the business away from Corizon.

119. A series of additional entities were formed between February 11, 2022, and April 5, 2022, including CHS FL, CHS GA, CHS KS, CHS NH, CHS New Jersey, CHS MO, and CHS NY. These entities were managed by YesCare and Sara Tirschwell.

120. There were also more than a dozen entities listed on an internal document as "To Be Filed," apparently for the purpose of bidding on new contracts in those respective states close

to times when such contracts were available for bidding, including:  CHS KY, CHS MD, CHS MI, CHS NM, CHS PA, CHS VA, CHS WY.  *See* **Exhibit K**, attached hereto.

121.    This internal document also identified the states of California, Indiana, Massachusetts, Mississippi, Nevada, and Tennessee as "in pipeline."

122.    No detail was too small to effectuate this scheme.  In one February 11, 2022 email, for example, defendant CLO Jeffrey Scott King directed a change from Corizon letterhead to YesCare letterhead after "talking to Isaac [Lefkowitz] and Sara [Tirschwell]" for writing to Arizona.  *See* **Exhibit L**, attached hereto.  Mr. King also asked that the phrase "YesCare, fka Corizon Health" be omitted from their response.  CHS AZ and possibly other CHS entities were representing themselves as mere continuations of Corizon before the divisional merger.

## C.    **The Divisional Merger**

123.    Next, as described below, Perigrove 1018 and Mr. Lefkowitz led the implementation of the Divisional Merger.

124.    On April 7, 2022, CHS Care TX, LLC, filed a *Certificate of Formation Limited Liability Company* with the Texas Secretary of State (Filing # 804510271).  *See* **Exhibit M**, attached hereto.  This Certificate identified YesCare Corp., 3411 Yoakum Blvd., Suite 2901, Houston, Texas 77006, as CHA Care TX, LLC's sole manager, and Sara Tirschwell, 3411 Yoakum Blvd., Suite 2901, Houston, Texas 77006, as CHS Care TX, LLC's sole organizer.

125.    On April 28, 2022, Corizon filed a *Certificate of Conversion of a Delaware Corporation to a Texas Corporation*, thereby converting Corizon from a Delaware corporation to a Texas Corporation.  *See* **Exhibit N**, attached hereto.  Jeffrey Scott King, Corizon's Chief Legal Officer, signed this Certificate.  Corizon, LLC, a Missouri limited liability company, and Corizon Health of New Jersey, LLC, a New Jersey limited liability company, remained subsidiaries of Corizon as of this date.

126.    On April 28, 2022, Valitás Health Services, Inc. filed a *Certificate of Conversion of a Delaware Corporation to a Texas Corporation*, thereby converting Valitás Health Services, Inc. from a Delaware corporation to a Texas Corporation.  *See* **Exhibit O**, attached hereto.  Jeffrey Scott King, Corizon's Chief Legal Officer, signed this Certificate

127.    On May 3, 2022, Corizon filed a *Certificate of Merger Combination Merger Business Organization Code* with the Texas Secretary of State, reflecting the merger of Corizon Health, Inc., Valitás Health Services, Inc., Corizon, LLC, and Corizon Health of New Jersey, LLC, with Corizon Health, Inc. as the surviving entity.  *See* **Exhibit P**, attached hereto. Valitás Health Services, Inc., Corizon, LLC, and Corizon Health of New Jersey, LLC did not survive the merger. Jeffrey Scott King, Corizon's Chief Legal Officer, signed this Certificate.

128.    The Certificate identified 205 Powell Place, Suite 104, Brentwood, Tennessee 37027 as the principal place of business for all the merger parties, including Corizon, as the surviving entity.  Following the merger, Corizon was vested with all assets and liabilities of Corizon, Valitás Health Services, Inc., Corizon, LLC, and Corizon Health of New Jersey, LLC.

129.    On May 3, 2022, Corizon filed a *Certificate of Merger Domestic Entity Divisional Merger Business Organization Code* with the Texas Secretary of State to form CHS TX, Inc. pursuant to a plan of merger under Section 3.0006 and Chapter 10 of the Texas Business Organization Code.  *See* **Exhibit Q**, attached hereto.  According to this Certificate, CHS TX's initial directors were Sara Tirschwell, Jeffrey Scott King, and Jeff Sholey.  Sara Tirschwell was identified as the Organizer.

130.    Along with the divisional merger certificate, Corizon filed a *Certificate of Formation* for CHS TX, Inc. with the Texas Secretary of State, which along with the divisional

merger, became effective on May 5, 2022.  *See* **Exhibit R**, attached hereto.  On or about May 5, 2022, YesCare appointed Sara Tirschwell as its Chief Executive Officer.

131.    On May 11, 2022, the Texas Secretary of State approved and accepted the *Certificate of Merger and Certificate of Formation* for CHS TX, Inc., effective as of May 5, 2022. CHS TX was subsequently acquired by YesCare.  *See* **Exhibit S**, attached hereto.

132.    M2 LoanCo, LLC and the Debtor agreed to a funding agreement (the "Funding Agreement") pursuant to which M2 LoanCo, LLC would pay or cause to be paid funding to Corizon up to an aggregate cap of $15 million for payment of Corizon's costs of operations and certain liabilities that arose prior to the Divisional Merger.

133.    On May 16, 2022, UCC-1 Financing Statements were filed with the Texas Secretary of State identifying YesCare Corp.'s and CHS TX, Inc.'s mailing address as 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.  *See* **Exhibit T** and **Exhibit U**, attached hereto.

134.    On June 1, 2022, Corizon filed a *Certificate of Amendment with the Texas Secretary of State* and changed its name from Corizon Health, Inc. to Tehum Care Service, Inc.  This Certificate was signed by Isaac Lefkowitz.  *See* **Exhibit V**, attached hereto.

135.    Upon information and belief, Mr. Lefkowitz is conversant in Hebrew and the word "Tehum" is a translation of the Hebrew "תְּהוֹם," meaning "abyss," often used to describe a chaotic and formless state of the world.

136.    Pursuant to the Divisional Merger, the Debtor, formerly Corizon and now Tehum, remained in existence and was allocated and remained vested with all inactive and expired customer contracts, as well as all historical liabilities related to such contracts, as well as extensive tort liabilities.

137. The purported consideration received by Tehum in the Divisional Merger was the release from its purported secured debt obligations to M2 LoanCo, which were allocated to CHS TX, $1 million in cash from the Corizon accounts (remaining cash going to the transferees), and the right to draw on the Funding Agreement.

138. The practical effect of the Divisional Merger was for Corizon to split its assets and liabilities among two entities. Tehum continued to house the disfavored liabilities, including the tort claims asserted by the inmates and their families, as well as liabilities owed to certain vendors and terminated employees. CHS TX was vested with Corizon's productive assets and its favored liabilities and became a YesCare subsidiary. Upon information and belief, Perigrove 1018's and Mr. Lefkowitz's intent was for YesCare to function as a mere continuation of Corizon.

**D.    The Fairness Opinion and Forged Bank Statement**

139. In connection with the Divisional Merger, ("FTI") was engaged to issue a fairness opinion in connection with the Divisional Merger. Mr. Lefkowitz and the other architects of the Divisional Merger wanted a third-party opinion that the transaction was "fair" to the company's unsecured creditors when compared with a restructuring scenario, in order to help counter any subsequent allegations or claims that the transaction constituted a fraudulent transfer. On May 1, 2022, FTI issued a fairness opinion (the "Fairness Opinion") containing a conclusion to that effect.

140. Contrary to the conclusions in the Fairness Opinion, FTI did not, in fact, confirm the fairness of the Divisional Merger. By its express terms, FTI's Fairness Opinion was predicated on factual information provided by Corizon, upon which FTI relied without confirming its accuracy. FTI did not conduct wide-scale due diligence.

141. FTI was affirmatively and intentionally misled. In order to obtain the Fairness Opinion, Corizon provided FTI records relating to its operations, bank accounts, and other

financials, including accounting and bank records that showed $22.3 million in cash maintained in the Corizon Signature Account.

142.    In reality, that cash had been stolen by Mr. Lefkowitz and his business partners months before FTI put pen to paper, and FTI's analysis featured a document Mr. Lefkowitz forged as part of his scheme to cover up that fact.

143.    Soon after creating the Signature Accounts, Mr. Lefkowitz began periodically directing Corizon accounting personnel to transfer funds to those accounts from Corizon's existing operating accounts.  When Corizon employees asked questions about the millions of dollars being sent to accounts no one at Corizon could access, Mr. Lefkowitz told them the funds were being held in the Signature Accounts for Corizon's benefit.

144.    Corizon's accounting department kept track of the transfers to the Signature Accounts and, believing the funds remained there and readily available for the company, included those amounts as assets in providing information to FTI for the Fairness Opinion.  But FTI could not conduct its analysis of the Corizon books and records without some level of verification that the financials were in order and devoid of obvious fraud.  This meant that any summary of company assets held in bank accounts required actual bank statements in order to be verified—a tall order because no one in Corizon's accounting department (or anywhere else at the company) had access to the Signature Accounts or accompanying statements.

145.    Mr. Lefkowitz and the other Defendants had a problem – FTI needed to confirm the amounts in the Signature Accounts, but providing the actual account statements would reveal their fraud to FTI and the Corizon accounting department.  As of February 28, 2022, rather than the $22.3 million the company's accounting department believed remained in the account, the

account contained a paltry $12,583.00.[6]  Mr. Lefkowitz stalled, but by late April, as the deadline for the Fairness Opinion and the planned Divisional Merger date approached, he had to provide evidence of the funds.

146.    Mr. Lefkowitz solved the problem by falsifying a bank statement for the Signature Bank Account.  On April 28, 2022, he provided Corizon employees and FTI with a statement purportedly showing that Corizon had $22,306,821.78 in the Corizon Signature Account as of February 28, 2022.  Three days later, Corizon's CFO sent FTI a Management Representation Letter stating that "[a]s of February 28, 2022, the Company's subsidiary Corizon, LLC held cash of approximately $22.3 million in a bank account that is not subject to a deposit account control agreement in favor of the collateral agent" under the company's existing secured debt, and FTI referenced this and other less blatant questionable statements of management in its flawed analysis.

## VII.    YesCare as the Mere Continuation of Corizon

147.    Following the Divisional Merger, YesCare operated as a mere continuation of Corizon.   YesCare continued to operate the business once operated by Corizon without interruption.  YesCare and CHS TX occupied the same principal place of business as Corizon at 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

148.    There was a continuity of management.  Following the Divisional Merger, in May of 2022, (a) Sara Tirschwell, the former Chief Executive Officer for Corizon, became the Chief Executive Officer for YesCare, (b) Ayodeji Olawale Ladele, the former Executive Vice President and Chief Medical Officer for Corizon, became the Executive Vice President and Chief Medical Officer for YesCare, (c) Beverly Michelle Rice, the former Corporate Controller for Corizon, became the Corporate Controller for YesCare, (d) Jeffrey Scott King, the former Chief Legal

---

[6]    The UCC obtained the account statements for the Signature Accounts in discovery during the Chapter 11 Case.

Officer at Corizon, became the Executive Vice President and Chief Legal Officer at YesCare, (e) Jennifer Lynne Finger, the former Assistant General Counsel at Corizon, became the Assistant General Counsel at YesCare, and (f) Frank Jeffrey Sholey, the former Chief Financial Officer at Corizon, became the Chief Financial Officer at YesCare, and later assumed the role of Chief Executive Officer for YesCare in February of 2023.

149.    There was a continuity of personnel.  All employees who worked for Corizon prior to the Divisional Merger became employees of YesCare and/or CHS TX.

150.    There was no change to the operating assets or general business operations.  There was no change to postage and packing or contract structures.  To ensure that YesCare continued to receive payments under the existing contracts, YesCare continued to use the same bank accounts as Corizon.  The operations of YesCare were virtually identical to those of Corizon prior to the mergers and the separation of assets from liabilities.

151.    In an email dated May 13, 2022, from Frias Elmeada, a Vice President of Operations at Corizon, to Tracy DeCaussin (a Jail Administrator in St. Clair County, Michigan), announcing that "the dedicated employees of Corizon have teamed up with a healthcare conglomerate to create YesCare, launching our new vision for correctional healthcare nationwide and announcing C-suite leadership to drive the company's next chapter as a leading correctional healthcare company," and that "[i]n the immediate term, this will not impact our service to you in any way."  *See* **Exhibit W**, attached hereto.  This email was sent from a @corizonhealth.com email account.

152.    In an email dated May 13, 2022, from Karen Davies, a Senior Vice President at YesCare, to Dan Singleton (an employee of the Brevard County, Florida, Sheriff's Office), announcing that "the dedicated employees of Corizon Health have teamed up with a healthcare

39

conglomerate to create YesCare, launching our new vision for correctional healthcare nationwide and announcing C-suite leadership to drive the company's next chapter as a leading correctional healthcare company," and that "[i]n the immediate term, this will not impact our service to you in any way." *See* **Exhibit X**, attached hereto. This email was sent from a @corizonhealth.com email account.

153.   In an email dated June 2, 2022, at 10:26AM, from Karen Davies, a Senior Vice President at YesCare, to Dan Singleton, YesCare represented that it had "acquired all the active business of Corizon," that "[t]here are no operational changes related to [the] transaction," "[s]taff, P&P, contract structures, etc. will all remain the same," and "[t]o ensure that payments under the contract continue without interruption" there "will be no change in bank account information." *See* **Exhibit Y**, attached hereto. This email was sent from a @Yescarecorp.com email account.

154.   In an email dated June 3, 2022, from Stacie Koch, a Vice President at YesCare Corp., to Kayla Opdahl (an administrator for the Wyoming Department of Corrections) and Ben Mathews (a supervisor for the Virginia Department of Corrections), sent to "follow-up" Corizon's "name change," YesCare represented that "YesCare acquired all of the active business of Corizon," "[t]here are no operational changes related to [the] transaction," "[s]taff, P&P, contract structures, etc. will all remain the same," and "[t]o ensure that payments under the contract continue without interruption" there "will be no change in bank account information." *See* **Exhibit Z**, attached hereto. This email was sent from a @Yescarecorp.com email account.

155.   On its website, newly formed YesCare held itself out to the public as "the leading provider of correctional healthcare services in the United States" and as having "over 35 years of history working with local and small businesses." *See* **Exhibit AA**, attached hereto.

40

156. There was a continuity of shareholders. Perigrove 1018 was the beneficial owner of Corizon prior to the Divisional Merger and became the beneficial owner of YesCare after the Divisional Merger. At all relevant times prior to the Divisional Merger, Mr. Lefkowitz controlled the operations of Corizon, and at all relevant times after the Divisional Merger, Mr. Lefkowitz controlled the operations of YesCare.

157. After the Divisional Merger, Tehum commenced a bankruptcy proceeding to liquidate its remaining assets. At the time Tehum declared bankruptcy, it had no employees or ordinary business operations. Upon information and belief, the transactions that resulted in YesCare operating as a mere continuation of Corizon were done with the intent of hindering, delaying, and defrauding Corizon's creditors, including the tort claimants.

## VIII. Perigrove 1018 and Mr. Lefkowitz as Alter Egos of Corizon

158. Following the acquisition of Corizon and its affiliates, Mr. Lefkowitz disregarded the separateness of these entities and treated Corizon as a mere conduit to enrich himself and Perigrove 1018, Corizon's ultimate parent company.

159. Perigrove 1018 and Corizon share common ownership and control. Perigrove 1018 is a private equity fund for which Mr. Lefkowitz serves as a director and partial owner. After Perigrove 1018 acquired Corizon, Mr. Lefkowitz became a director or officer of nearly every entity in Corizon's organizational structure, including M2 LoanCo, M2 HoldCo, Valitás Intermediate Holdings, Valitás Health, and Corizon. Many of these entities lack officers or employees, making Mr. Lefkowitz the primary or sole decision maker for much of Corizon's organizational structure.

160. Between December 2021 and February 2023, Mr. Lefkowitz served as the sole director of Corizon and oversaw all aspects of its operations and finances. He was also one of two directors of M2 LoanCo, which had no employees or other operational structure. M2 LoanCo's sole member was M2 HoldCo, for which Mr. Lefkowitz served as the sole director.

161. Using his control, Mr. Lefkowitz caused Corizon and its affiliates to commingle and divert funds and assets for the benefit of Perigrove 1018 and himself. As noted above, immediately after its acquisition, Corizon opened the Signature Accounts, for which only Perigrove 1018 members were signatories.

162. Between December 2021 and November 2022, nearly $25 million moved from Corizon's existing bank accounts at Bank of America to the Signature Accounts. These funds were then transferred to M2 LoanCo. Upon information and belief, these funds were ultimately transferred to Perigrove 1018, in which Mr. Lefkowitz has an equity stake.

163. Similarly, in December 2021, Mr. Lefkowitz, as "Interim CEO" of Valitás Health, Corizon's then immediate parent company, executed the Consulting Agreement with Geneva. As a result of the Consulting Agreement, Corizon transferred $5,500,000 to Geneva between December 2021 and May 2022. Upon information and belief, Geneva and Perigrove 1018 share common directors and authorized representatives, including Mr. Lefkowitz.

164. Between January and February 2022, Corizon's funds paid certain obligations of PharmaCorr, an indirect subsidiary of Valitas Health. Over $950,000 was transferred from Corizon to a third-party vendor on PharmaCorr's behalf.

165. Additionally, Mr. Lefkowitz caused Corizon to enter into a services contract with Sigma Risk Management under which Sigma Risk Management would handle Corizon's professional liability claims for $150,000 per month. Upon information and belief, Sigma Risk Management was formed by Mr. Lefkowitz in October 2022, and at all relevant times, Mr. Lefkowitz was a director of Sigma Risk Management.

166. Perigrove 1018 and Mr. Lefkowitz knowingly undercapitalized Corizon. After the Divisional Merger, which was orchestrated by, *inter alia*, Perigrove 1018 and Mr. Lefkowitz,

42

Corizon became Tehum and was saddled with over $185 million in liabilities. Because of the Divisional Merger, Tehum had no employees or productive assets and was provided with a funding agreement with an aggregate cap of $15 million for payment of Corizon's operating costs and liabilities that arose prior to the Divisional Merger.

167. Perigrove 1018 and Mr. Lefkowitz disregarded Corizon's corporate separateness, transferred Corizon's funds to other entities under their control, arranged for insider loans (including the DIP Loan discussed below), and ultimately caused all of Corizon's operating assets to be transferred to CHS TX, which became a subsidiary of YesCare.

## IX.    Pre-Bankruptcy Litigation

168. After completing the Divisional Merger and implementing "Project Orange," YesCare encountered several headwinds to implementing the fraud.

### A.    Litigation in Federal Court in the Eastern District of Michigan

169. On July 26, 2022, plaintiffs Kohchise Jackson and William Kelly, through their counsel, filed a motion to substitute YesCare and CHS TX as party defendants in place of Corizon in lawsuits pending in the Eastern District of Michigan, Southern Division.

170. In support of this request, Mr. Jackson and Mr. Kelly asserted that YesCare and CHS TX were alter-egos, successors, or mere continuations of Corizon. The exhibits attached to this motion reflect Mr. Kelly's awareness of the Divisional Merger and the post-merger communications made by YesCare employees to various parties.

171. At this time, however, information regarding YesCare's formation and the diversion of new business contracts to CHS entities was not disclosed and was not publicly available. This meant that Mr. Jackson and Mr. Kelly litigated alter ego and successor liability issues based on a partial factual record indicating that CHS TX was the successor to Corizon, and that YesCare was simply CHS TX's parent.

43

172.    On November 1, 2022, the Federal Court in Michigan found that after the Divisional Merger, YesCare, a corporation owned by CHS TX's CEO, acquired CHS TX, and that CHS TX could be held liable as Corizon's successor.  The Court held, based on the evidence before it, that CHS TX was a mere continuation of pre-division Corizon.

173.    The Court found that no explanation had been provided to it regarding YesCare's relationship to CHS TX and that the record before it did not demonstrate any abuse of the corporate form by YesCare.  At this time, YesCare was largely successful in hiding its pre-divisive merger role in diverting future business contracts away from Corizon.

174.    The Federal Court in Michigan, therefore, granted the plaintiffs' request to add CHS TX as a defendant.  *See Jackson v. Corizon Health Inc.*, 2:19-cv-13382, 2022 WL 16575691 (E.D. Mich. Nov. 1, 2022) ("*Jackson*"); *Kelly v. Corizon Health Inc.*, No. 2:22-cv-10589, 2022 WL 16575763 (E.D. Mich. Nov. 1, 2022) ("*Kelly*").  This meant that any creditor of Corizon could add CHS TX as a defendant if the injury arose before the Divisional Merger.

**B.      Litigation in State Court in Missouri**

175.    On May 11, 2022, the Curators of the University of Missouri and Capital Region Medical Center filed a lawsuit against Corizon, and Corizon, LLC in the Circuit Court of Boone County, Missouri, Case No. 22BA-CV01701, asserting claims for failing to reimburse the Missouri Hospital for impatient or outpatient care by or at the direction of Corizon.

176.    On June 21, 2022, Corizon filed a notice of removal from the Circuit Court in Boone County, Missouri, to the Federal District Court for the Western District of Missouri, alleging that the plaintiffs were citizens of Missouri and that the defendant was a citizen of Texas and Tennessee.  The case, however, was remanded back to the State Court on September 9, 2022.

177.    On remand, the plaintiffs pursued Corizon, YesCare, and CHS TX to recover damages.  This litigation culminated in a 60-page motion for preliminary injunction against

44

YesCare and CHS TX and for appointment of a receiver over Corizon, detailing actions taken by YesCare's and Corizon's officers and directors to move assets from Corizon to hinder, delay, and defraud creditors.

178. On February 9, 2023, Boone County Circuit Court Judge Josh Devine held a half-day hearing on the plaintiffs' motion for preliminary injunction and YesCare and CHS TX's motion to dismiss. After denying YesCare and CHS TX's motion to dismiss from the bench, the Court held an evidentiary hearing on plaintiffs' 60-page motion for preliminary injunction and appointment of a receiver.

179. YesCare and CHS TX, for their part, did not deny the facts presented in the plaintiffs' motion. Rather, they bemoaned that their conduct was lawful and threatened, if the Court dared to enter an order on the plaintiffs' motion, to stop paying their employees, stop providing care to the nearly 50,000 inmates in their charge, and to file for bankruptcy.

180. At the hearing's end, Judge Devine ordered plaintiffs to submit a proposed order by the next day, Friday, at the close of business. But with Friday's deadline less than 36 hours away, the defendants needed time; time they could only secure with the plaintiffs' cooperation.

181. On Thursday evening, shortly after the hearing, the defendants initiated sham settlement discussions with the plaintiffs, quadrupling their last settlement offer. And by Friday afternoon, the defendants led the plaintiffs to believe they agreed to a settlement amount, with a term sheet in process. Having lured the plaintiffs into believing the false prospect of settlement by Friday afternoon, the plaintiffs asked for—and received—an extension from Judge Devine until Monday based on the parties' agreement. But, upon information and belief, the defendants had no intention of settling.

**X.      The Bankruptcy Case**

182.     Instead, on February 13, 2023 (the "Petition Date"), Mr. Lefkowitz directed Tehum to file for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

183.     On February 13, 2023, the Debtor retained Russell A. Perry, a Senior Managing Director of Ankura Consulting Group, LLC, as its Chief Restructuring Officer.

184.     On February 15, 2023, the Debtor filed its *Application for Entry of an Order Authorizing the Retention and Employment of Gray Reed as Counsel to the Debtor, Effective as of the Petition Date.  See* Bankr. Dkt. No. 187.  Upon information and belief, Gray Reed was hired as bankruptcy counsel the weekend prior to the filing and had no prior involvement with Corizon, YesCare, or Isaac Lefkowitz.

185.     On February 15, 2023, the Debtor filed its *Application for Entry of an Order (I) Authorizing the Retention and Employment of Ankura Consulting Group, LLC as Financial Advisor and (II) Designating Russell A. Perry as Chief Restructuring Officer, Effective as of the Petition Date*.  *See* Bankr. Dkt. No. 188.

186.     On March 2, 2023, the United States Trustee for the Southern District of Texas filed a *Notice of Appointment of Official Committee of Unsecured Creditors* and appointed the following eligible creditors to the Official Committee of Unsecured Creditors (the "UCC") in the Chapter 11 Case:  St. Luke's Health System, Ltd.; Capital Regional Medical Center; Maxim Healthcare Staffing Services, Inc.; Saint Alphonsus Health System, Inc.; Truman Medical Center, Inc.; and Rachell Garwood.  *See* Bankr. Dkt. No. 77.

187.     On March 6, 2023, the United States Trustee for the Southern District of Texas filed an *Amended Notice of Appointment of Official Committee of Unsecured Creditors* and appointed the following eligible creditors to the UCC in the Chapter 11 Case:  St. Luke's Health System,

46

Ltd.; Capital Regional Medical Center; Maxim Healthcare Staffing Services, Inc.; Saint Alphonsus Health System, Inc.; Truman Medical Center, Inc.; Rachell Garwood; and Latricia Revell. *See* Bankr. Dkt. No. 145.

188.    On March 15, 2023, Russell A. Perry filed a Declaration with the Bankruptcy Court in support of certain first day motions and represented that "the Debtor engaged independent financial firm, FTI Capital Advisors, LLC ('FTI'), to render a fairness opinion on the proposed divisional merger," that "FTI conducted widescale due diligence, including a review and analysis of the Debtor's financial history and contingent liabilities," and that "[u]ltimately, the conclusion was reached that the proposed divisional merger provided the Debtor's unsecured creditors with access to equal or greater value than not completing the merger."   *See* Bankr. Dkt. No. 186 (the "Perry Declaration").

189.    On March 17, 2023, FTI, through its counsel at Reed Smith LLP, sent a letter to the Debtor and Ankura disputing certain assertions made by Russell Perry in the Perry Declaration. *See* **Exhibit BB**, attached hereto.  FTI asserted that its Fairness Opinion "specifically set forth the factual information provided by Corizon upon which FTI relied in rendering its [Fairness] Opinion, and noted that FTI was relying on the factual accuracy of the information provided, and that "the statements in the [Perry Declaration] that FTI 'conducted widescale due diligence' is misleading and overstates the scope of FTI's assignment."

190.    On March 23, 2023, the Debtor filed a *Complaint Seeking (I)(A) a Declaratory Judgment that the Automatic Stay Applies to Certain Claims and Causes of Action Asserted Against Certain Non-Debtors and (B) an Extension of the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) a Preliminary Injunction Related to Such Actions*.  *See* Adv. No. 23-03049, Dkt. No. 1.

191.    In this Complaint, the Debtor took the position that claims asserted against YesCare and/or CHS TX "based on alter ego, veil piercing, successor liability, fraudulent transfer, and/or similar theories" became "property of the Debtor's estate under 11 U.S.C. § 541(a)" when the Debtor filed for bankruptcy on the Petition Date and that "the pursuit of such claims by a non-debtor is a violation of Bankruptcy Code section 362(a)(3)." *Id.* at ¶ 5.

192.    Upon information and belief, the Debtor threatened to bring contempt proceedings against attorneys representing claimants if they tried to continue litigation against YesCare and CHS TX based on such theories of liability.

193.    The Debtor took the position that claims that tort victims could assert outside the bankruptcy proceeding under state law against YesCare and CHS entities became estate property that the Debtor could settle in its bankruptcy case.  Such claims included the claims asserted by the plaintiffs in the action pending before the Eastern District of Michigan in *Kelly* and *Jackson*.

194.    The Settlement Parties were on notice and aware that the Divisional Merger could be challenged and avoided as a fraudulent transfer.  *See*, *e.g.*, *Official Comm. of Asbestos Personal Injury Claimants v. DBMP LLC*, No. 21-03023-JCW (Bankr. W.D.N.C. July 7, 2022), Hr'g Tr. at 23-25 (finding that it would be "contrary to all Anglo-American notions of fraudulent conveyance law" for the victims of a fraudulent divisional merger conducted under Texas law to have "no recourse" against the entity that received the operating assets).

195.    The intended impact of the Chapter 11 Case was to shut down all litigation against YesCare and CHS TX and shield their assets from the Debtor's creditors.

196.    By the Petition Date, as it had been since the Divisional Merger closed the prior year, the Debtor was an empty shell.  However, the Debtor still served as a useful vehicle through which Mr. Lefkowitz, Perigrove 1018, YesCare, and CHS TX could seek to obtain releases and

48

shield themselves from liability.  Mr. Lefkowitz intended to use the Chapter 11 Case to settle claims that creditors could bring against Mr. Lefkowitz, Perigrove 1018, YesCare, and CHS TX.

### A.   The Insider DIP Loan

197.   On March 15, 2023, the Debtor filed its *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion").  *See* Bankr. Dkt. No. 185.  The DIP Motion set forth the terms of a senior secured loan (the "DIP Loan") funded by M2 LoanCo.

198.   On March 22, 2023, the Bankruptcy Court held a hearing and entered the *Interim DIP Order (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims for Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "First Interim DIP Order").  *See* Bankr. Dkt. No. 243.  The First Interim DIP Order was amended and supplemented pursuant to Bankruptcy Docket No. 476, Bankruptcy Docket No. 579, Bankruptcy Docket No. 993, and Bankruptcy Docket No. 1669.

199.   At all relevant times, Mr. Lefkowitz was one of M2 LoanCo's two directors.  The DIP Loan was an insider loan and was used by Mr. Lefkowitz to pay for the cost of administering the Chapter 11 Case so that Mr. Lefkowitz, Perigrove 1018, YesCare, CH TX and others could seek releases in the Chapter 11 Case to shield themselves from personal liability.

### B.   The Senate Inquiry

200.   On October 24, 2023, Senator Warren, Senator Durbin, Senatore Hirono, Senator Merkley, Senator Blumenthal, Senator Wyden, Senator Sanders, Senator Welch, and Senator Booker sent a letter to Jeffrey Sholey, Chief Executive Officer of YesCare Corp., and Isaac

Lefkowitz, the sole director of Tehum Care Services, Inc., raising questions about the Divisional Merger and subsequent chapter 11 filing and requesting information (the "Senate Letter"). *See* **Exhibit CC**, attached hereto.

201. On November 15, 2023, YesCare, through its counsel at Akin Gump Strauss Hauer & Feld LLP, responded to the Senate Letter. *See* **Exhibit DD**, attached hereto. In its response, YesCare asserted that its executive leadership team included the following individuals: Jeffrey Sholey, Chief Executive Officer; Jimmy Sprouse, Chief Financial Officer; Bill Barr, Chief Operating Officer; Jeffrey Scott King, Chief Legal Officer; and Dr. Gregory Ladele, Chief Medical Officer. YesCare also asserted that Isaac Lefkowitz was a director of YesCare.

202. On November 15, 2023, the Debtor, through its counsel at Gray Reed, responded to the Senate Letter. *See* **Exhibit EE**, attached hereto. In its response, the Debtor asserted that Mr. Perry is the Debtor's Chief Restructuring Officer. The Debtor also asserted that Isaac Lefkowitz is "one of the investors in Perigrove 1018," the "sole director of the Debtor," and "oversaw every aspect of Corizon's operations and finances" prior to the Petition Date.

### C. The Appointment of the Tort Claimants' Committee

203. On November 20, 2023, the United States Trustee for the Southern District of Texas filed a *Notice of Appointment of Committee of Tort Claimants* and appointed the following eligible creditors to the Committee of Tort Claimants (the "TCC") in the Chapter 11 Case: Aanda Slocum, Elizabeth Frederick, Henry Snook, LaTonda Smith, Nathan Alvarez, and Paris Morgan. *See* Bankr. Dkt. No. 1127.

### D. TCC and UCC Sponsored Chapter 11 Plan

204. Following a mediation held on or about May 6, 2024, in New York, New York, with Christopher S. Sontchi, former Chief Judge for the United States Bankruptcy Court for the District of Delaware, the parties reached an agreement regarding the terms of a consensual plan.

50

205. The TCC members would not support a settlement conditioned upon the Court's approval of non-consensual third-party releases or their equivalent. This meant that tort claimants who did not want to participate in the settlement would have the right to "opt out" and pursue their claims in the civil justice system. YesCare and the other Settling Parties required some degree of finality, although not 100% finality, and would not fund a settlement unless a high percentage of the tort claimants elected to participate.

206. The Plan resolved this tension. Through the Plan, the Disclosure Statement, and the Solicitation Procedures, tort claimants would be offered a choice. First, they could elect to participate in the Plan settlement after being informed of how their claims would be valued and what distribution they could expect to receive on account of their claims.

207. Second, claimants whose claims were covered by insurance could elect to test the waters with insurers and return to the PI/WD Trust under certain circumstances. Third, claimants could elect to "opt out" of the Plan settlement entirely and pursue recoveries from CHS TX and YesCare under the doctrine of successor liability in the civil justice system.

208. Claimants had to make their decision by the Voting Deadline. Claimants who elected to participate in the Plan settlement would be deemed to provide a release similar in scope to a private out-of-court settlement—*i.e.,* the "Consensual Claimant Release." Claimants who elected to "opt out" would not be deemed to grant such a release.

209. Since the election had to be made by the Voting Deadline, YesCare would have the information that it needed to evaluate the settlement after the Voting Deadline passed (but prior to the Confirmation Hearing). Settlement Parties could walk away if more than 5% of the number of Voting PI/WD Claimants elected to opt out of the Consensual Claimant Release.

210.     Further, the Debtor and YesCare controlled the noticing process.   Thus, to maximize the benefit of the Consensual Claimant Release, the Debtor and YesCare were incentivized to ensure that all known claimants received actual notice.

211.     At Plan confirmation, by virtue of the Debtor's notice program and the results of the claimants' elections, the Settling Parties would have visibility into the universe of claimants whose claims would be resolved by the PI/WD Trust and the claimants whose claims would be resolved in the civil justice system.

212.     Another issue that the Plan addressed was the process by which unliquidated claims held by non-opt outs would be liquidated post-confirmation.   Under Article III of the Plan, all "Channeled PI/WD Claims"—*i.e.*, PI/WD Claims held by non-opt outs—would be incurred in full and assumed by the PI/WD Trust and liquidated in accordance with the PI/WD Trust Documents.

213.     The Plan expressly provides all Channeled PI/WD Claims shall be finally determined by the PI/WD Trust in accordance with the PI/WD Trust Distribution Procedures, without any further right to seek review or adjudication of such claims by any court, including the Bankruptcy Court.   GUC Trust Agreement establishes the method by which the Channeled GUC Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid.

214.     Another issue that the Plan addressed was how the Trusts would be funded and the consequences of a payment default.   The TCC and the UCC preferred for the Settlement Parties to fund the full amount of the settlement—*i.e.*, $50 million—on the Effective Date.

215.     The concern was obvious given the Settlement Parties' role in the prepetition transactions, which raised the possibility that the Settlement Parties would engage in similar fraudulent conduct in the future to avoid their payment obligations under the Plan.   The Settlement

Parties, in turn, would not agree to a lump-sum payment and demanded the ability to pay the settlement amount over thirty months.

216.   The Plan resolved this conflict.  The Settlement Parties were afforded the right to pay over 30 months (*see* Plan at Art. IV.B.1), subject to certain negotiated consequences if they failed to make the payments.

217.   Article IV.B.1 of the Plan provides that the Settlement Parties shall pay or cause to be paid to the PI/WD Trust and GUC Trust, as applicable, aggregate Cash in the amount of Fifty Million Dollars ($50,000,000.00), as follows:  (i) on or before the Effective Date, the Settlement Parties shall pay or cause to be paid to the Debtor's estate Cash in the amount of Two Million Dollars ($2,000,000.00) which shall be contributed to the PI/WD Trust and the GUC Trust on the Effective Date; and (ii) the remaining Forty-Eight Million Dollars ($48,000,000.00) shall be paid over thirty (30) months with interest at 6.00% per annum on the unpaid balance, with each installment payment being due on the fifteenth (15th) day of each month (or, if such day is not a Business Day, the next succeeding Business Day) until all Installment Settlement Payments have been made, with the final installment, being made no later than thirty (30) months after the Effective Date (or, if such day is not a Business Day, the next succeeding Business Day).

218.   Exhibit D to the Plan Supplement (filed on February 7, 2025), set forth the payment schedule for the Settlement Payment, and reflected the initial payment of Two Million Dollars ($2,000,000.00) and each of the Installment Settlement Payments (with accrued interest). *See* Bankr. Dkt. No. 1955-4 (the "Settlement Payment Schedule").

219.   Under the Plan, the Trusts would then make distributions to claimants using the Settlement Payments.  Article III of the Plan makes it clear that Holders of Allowed Channeled

Claims are entitled to receive a distribution from the Trust Assets, and the Settlement Payments are Trust Assets intended to facilitate distributions to claimants.

220.    Under the Plan, the DIP Loan is deemed fully and forever discharged and released on the Effective Date.  *See* Plan at Art. II.C.  But the releases provided under Article IV.B.7 (Consensual Claimant Release) and Article IV.B.9 (Estate Causes of Action Release) do not go into effect unless and until the "Final Payment Date."

221.    Thus, the Released Parties cannot get the benefit of either release unless the settlement payments are made in accordance with the Plan.  Further, under the Plan, the Estate Causes of Action against the Released Parties are transferred to the Trusts and can be prosecuted by the Trusts following a payment default.  Thus, under the Plan, the Settlement Parties must either make the required payments or face litigation.

222.    Under the Plan, the Channeling Injunction is the only injunction that goes into effect on the Effective Date, which injunction was designed to serve as a bridge between the Effective Date and the Final Payment Date.  The Channeling Injunction offers the Released Parties various protections.  But those protections fall away if a payment default is declared and such default is not cured or waived within five business days.  *See* Plan at Art. IX.I.5.

223.    If the Channeling Injunction terminated, the Trusts would then have 90 days to commence or revive litigation against the Released Parties.  *See* Plan at Art. IV.B.2 & Art. IX.I.6.  Again, the purpose of these Plan provisions was clear:  if the Settlement Parties defaulted, then Trusts would bring the Causes of Action set forth in this Complaint.

E.    **Solicitation and Plan Confirmation**

224.    On November 13, 2024, the Court entered the *Order (I) Approving Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving Form and Manner of Notice to Claim Holders (IV) Approving Form*

54

*of Ballots, (V) Approving Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan, and (VII) Granting Related Relief.* See Bankr. Dkt. No. 1813.

225. The Solicitation Procedures Order established, *inter alia*, the Solicitation Procedures. Pursuant to the Solicitation Procedures Order, on November 20, 2024, Verita Global commenced service of the Solicitation Packages.

226. On February 25, 2025, the Debtor filed the *Declaration of Darlene S. Calderon Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor Under Chapter 11 of the Bankruptcy Code* (the "Tabulation Report"). *See* Bankr. Dkt. No. 1993.

227. Less than 5% of the number of Voting PI/WD Claimants elected to opt out of the Consensual Claimant Release. Exhibit A-5 to the Tabulation Report reflected that William Kelly and Kohchise Jackson, among others, elected to "opt out" of the Consensual Claimant Release.

228. On March 3, 2025, the Bankruptcy Court entered the *Order Confirming the First Modified Joint Chapter 11 Plan of Reorganization of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor.* *See* Bankr. Dkt. No. 2014.

229. Paragraph 42 of the Confirmation Order provides: "All Statute of Limitations for all Claims and Causes of Action against the Released Parties held by the Debtor, the Estate, the PI/WD Trust, the GUC Trust, and Holders of Channeled Claims shall be tolled and extended to the first Business Day that is ninety (90) days after the termination of the Channeling Injunction as provided in Article IV.B.2 of the Plan."

230. On March 31, 2025, the Plan became effective, and the PI/WD Trust and the GUC Trust were established pursuant to the terms of the Confirmation Order and the Plan as set forth in

55

the *Notice of Entry of (I) Confirmation Order, (II) Occurrence of Effective Date, (III) Administrative Claims Bar Date, and (IV) Other Claims Deadlines*. *See* Bankr. Dkt. No. 2088. Under the Plan, "Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), is deemed to occur on the Effective Date. *See* Plan at Art. X.D.

## XI.    Post-Confirmation Litigation

231.    After the Effective Date, the Settlement Parties began to make the required payments. During the timeframe between April 11, 2025 and August 21, 2025, the Settlement Parties made the following payments totaling $13,607,500.00 to the Trusts that were applied to the Settlement Payment: $2,000,000.00 paid on April 11, 2025, $240,000.00 paid on May 5, 2025, $3,740,000.00 paid on May 14, 2025, $3,222,500.00 paid on June 24, 2025, $2,207,500.00 paid on July 16, 2025, and $2,197,500.00 paid on August 21, 2025.

232.    William Kelly and Kohchise Jackson, two of the tort claimants who elected to "opt out" of the Consensual Claimant Release, resumed litigation before the Federal Court in Michigan. Kohchise Jackson's case went to trial in 2026. Mr. Lefkowitz was forced to appear in the Michigan action and repeatedly invoked the Fifth Amendment privilege against self-incrimination as a basis for not testifying.

233.    As a result, Mr. Jackson moved for an adverse inference instruction, which the Court granted on March 30, 2026. On April 2, 2026, following an eight-day trial regarding the denial of medically necessary surgery for a colostomy reversal, a federal jury in Detroit awarded Mr. Jackson $7.5 million in non-economic damages and $300 million in punitive damages.

234.    After the Effective Date, it was discovered that the Debtor and YesCare had failed to provide actual notice to several known claimants. By an order entered on August 7, 2025, the Bankruptcy Court ruled that known claimants who were not served with the Opt-Out Release Form are not bound by the consensual third-party releases in the Plan. *See* Bankr. Dkt. No. 2374.

56

## XII.     **Settlement Payment Default**

235.     After making the initial payments, the Settlement Parties failed to make the required payments in full due on or after August 15, 2025.  On January 26, 2026, the Trusts filed the *Notice of Settlement Payment Default and Settlement Payment Default Cure Notice.  See* Bankr. Dkt. No. 2591.  By this notice, the Trusts asserted that the Settlement Parties failed to make the Installment Settlement Payments due on September 15, 2025, October 15, 2025, November 15, 2025, December 15, 2025, and January 15, 2026.

236.     During these months, the Settlement Payment Schedule required principal payments of $7,500,000.00 plus scheduled interest of $850,000.00, for a total of $8,350,000.00.

237.     The Settlement Parties ultimately acknowledged that they had failed to fully cure the missed Installment Settlement Payment due on August 15, 2025, and they failed to make the Installment Settlement Payments due on September 15, 2025, October 15, 2025, November 15, 2025, December 15, 2025, and January 15, 2026 (collectively, the "Designated Defaults").

238.     On February 1, 2026, to provide the Settlement Parties with the opportunity to cure the Designated Defaults, the Trusts entered into a Cure Agreement with YesCare and its wholly owned subsidiaries (including CHS TX), Geneva, Perigrove 1018, Perigrove, M2 HoldCo, M2 LoanCo, and PharmaCorr.  *See* Bankr. Dkt. No. 2602 at Ex. A (the "Cure Agreement").

239.     Section 11 of the Cure Agreement provides that the Cure Agreement "shall be deemed to be made in the State of Texas and shall be interpreted in accordance with the laws of the State of Texas, without regard to conflict of law principles," and that "[b]y executing this Agreement, the Settlement Parties agree that in the event litigation arises between the Parties in connection with this Agreement, the Settlement Parties consent to the jurisdiction and venue before the Bankruptcy Court."

240. The Settlement Parties duly tendered the initial payment of $2.3 million required by the Cure Agreement. However, they defaulted again almost immediately and failed to make the Installment Settlement Payment due on February 17, 2026, in the amount of $2,012,022.75.

241. As a result, on February 25, 2026, the Trusts filed the *Notice of Settlement Payment Default and Settlement Payment Default Cure Notice* and provided written notice to the Settlement Parties' counsel in accordance with the Plan that the Settlement Parties failed to make the Installment Settlement Payment due on February 17, 2026, in the amount of $2,012,022.75. *See* Bankr. Dkt. Nos. 2602-1 & 1955-4. Pursuant to this notice and the Plan, the Settlement Parties were required to cure the default by Wednesday, March 4, 2026. The Settlement Parties did not make the missed Installment Settlement Payment by this deadline.

242. As a result, on March 4, 2026, the Trusts filed the *Notice of Failure to Cure Settlement Payment Default; Automatic Termination of Channeling Injunction; and Deadline to Commence Causes of Action Against Released Parties*. *See* Bankr. Dkt. No. 2617.

243. Pursuant to the Confirmation Order and the Plan, the Channeling Injunction has terminated, and all Statute of Limitations for all Claims and Causes of Action against the Released Parties held by the Plaintiffs were extended to the first Business Day that is ninety (90) days after the termination of the Channeling Injunction, or June 3, 2026. The Plaintiffs now bring forward this Complaint to recover for the victims of the fraud.

244. Importantly, these events did not change the Plan's treatment of Channeled Claims—*i.e.*, Channeled GUC Trust Claims and Channeled PI/WD Trust Claims—as set forth in Article III of the Plan. The Holders of such Channeled Claims are entitled to receive cash distributions from the Trusts in accordance with the terms and conditions set forth in the Trust

Documents, which establish the methods by which Channeled Claims against the Debtor will be resolved and how such Channeled Claims will be submitted, processed, liquidated, and paid.

**COUNT I**
**Actual Fraudulent Transfer — Avoiding the Divisional Merger**
**Pursuant to 11 U.S.C. §§ 544(b)(1), 548(a)(1)(A), 550**
**and Applicable State Fraudulent Transfer Law**
**(Against CHS TX)**

245. The Plaintiff's restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

246. Corizon's active contracts, employee assets, and other viable assets that were allocated to CHS TX pursuant to the Divisional Merger were property of Corizon at the time of the Divisional Merger. Upon information and belief, the parties that orchestrated the Divisional Merger acted with the actual intent to hinder, delay, and defraud Corizon's creditors.

247. The transactions effectuated as part of the Divisional Merger caused the allocation of the Debtor's active contracts, employee assets, and other viable assets to CHS TX. This allocation constitutes a "transfer" subject to avoidance under 11 U.S.C. § 548 and state law enactments of the Uniform Voidable Transfers Act or other applicable state fraudulent transfer statute.

248. The following "badges of fraud," among other applicable badges of fraud, establish that the allocation of assets away from the Debtor through the Divisional Merger was intended to hinder and delay the payment of the Debtor's creditors or to defraud the Debtor's creditors of any payment of their claims: (a) the allocation of assets to CHS TX was to an insider of the Debtor or an entity controlled by an insider of the Debtor; (b) at the time of the Divisional Merger there were numerous pending and threatened lawsuits against the Debtor; (c) the allocation transferred substantially all of the Debtor's valuable assets away from it; (d) the Debtor received no value in

59

exchange for the allocation of its assets to CHS TX; and (c) the Debtor was insolvent or became insolvent as a result of the Divisional Merger.

249. The Divisional Merger was a fraudulent transfer under the Bankruptcy Code, the Uniform Voidable Transfers Act and other applicable state fraudulent transfer statute and should be avoided pursuant to 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544(b)(1) and state law enactments of § 4(a)(1) of the Uniform Voidable Transfers Act or other applicable state fraudulent transfer law.

250. The assets transferred away from the Debtor via the Divisional Merger should be recovered pursuant to 11 U.S.C. § 550.

**COUNT II**
**Constructive Fraudulent Transfer — Avoiding the Divisional Merger**
**Pursuant to 11 U.S.C. §§ 544(b)(1), 548(a)(1)(B), 550**
**and Applicable State Fraudulent Transfer Law**
**(Against CHS TX)**

251. The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

252. Corizon's active contracts, employee assets, and other viable assets that were allocated to CHS TX pursuant to the Divisional Merger were property of Corizon at the time of the Divisional Merger.

253. The transactions effectuated as part of the Divisional Merger caused the allocation of Corizon's active contracts, employee assets, and other viable assets to CHS TX. This allocation constitutes a "transfer" subject to avoidance under 11 U.S.C. § 548 and state law enactments of the Uniform Voidable Transfers Act or other applicable state fraudulent transfer statute.

254. The Divisional Merger became effective on May 5, 2022. The Debtor commenced its bankruptcy case on February 13, 2023, less than one year later.

255.   Corizon did not receive any value in exchange for the allocation of its assets to CHS TX.

256.   Corizon was left (a) insolvent, (b) with unreasonably small capital to continue its business, and (c) without the means to pay debts it expected to incur because of the Divisional Merger.  In addition, the Divisional Merger allocated Corizon's assets to an insider and for the benefit of other insiders.

257.   The Divisional Merger was a fraudulent transfer under the Bankruptcy Code, the Uniform Voidable Transfers Act and other applicable state fraudulent transfer statute and should be avoided pursuant to 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b)(1) and state law enactments of § 4(a)(2) of the Uniform Voidable Transfers Act or other applicable state fraudulent transfer law.

258.   The assets transferred away from Corizon via the Divisional Merger should be recovered pursuant to 11 U.S.C. § 550.

**COUNT III**
**Aiding & Abetting Fraudulent Transfer**
**(Against Mr. Lefkowitz, Ms. Tirschwell, and Mr. King)**

259.   The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

260.   Mr. Lefkowitz directed outside counsel to develop the restructuring scheme that involved two merger transactions under the Texas Business Organizations Code and a chapter 11 bankruptcy filing.

261.   Following a May 1, 2022, presentation on the two-merger scheme, the Corizon Board voted to proceed with the scheme.  Mr. Lefkowitz, Ms. Tirschwell, and Mr. King signed all documents necessary to effectuate the scheme.  The Divisive Merger became effective on May 5, 2022.

262.    Mr. Lefkowitz's, Ms. Tirschwell's, and Mr. King's assent to the restructuring scheme that included the Divisional Merger and their execution of all documents necessary to effectuate the scheme enabled the fraudulent transactions set forth in Counts I and II of this Complaint.

263.    As set forth above, there are viable claims for actual and constructive fraud related to the restructuring scheme agreed to and effectuated by Mr. Lefkowitz, Ms. Tirschwell, and Mr. King.  The Debtor's involvement in the Divisional Merger caused injury to its creditors.

264.    Mr. Lefkowitz, Ms. Tirschwell, and Mr. King knowingly and substantially assisted the Debtor in the implementation of the restructuring scheme, especially with respect to executing all documents necessary to effectuate the mergers.

265.    The Debtor's creditors have been injured by the restructuring plan agreed to and effectuated by Mr. Lefkowitz, Ms. Tirschwell, and Mr. King.

266.    The Plaintiffs are entitled to recover damages against Mr. Lefkowitz, Ms. Tirschwell, and Mr. King in an amount to be determined at trial.

### COUNT IV
**Actual Fraudulent Transfer — Avoiding Transfers to Geneva, M2 LoanCo, and PharmaCorr Pursuant to 11 U.S.C. §§ 544(b)(1), 548(a)(1)(A), 550 and Applicable State Fraudulent Transfer Law (Against Geneva, M2 LoanCo, and PharmaCorr)**

267.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

268.    As explained in detail above, Corizon transferred $5.5 million to Geneva between January 9, 2021, and May 2, 2022.

269.    As explained in detail above, Corizon transferred $24,538,155.19 to M2 LoanCo between January 29, 2021, and November 14, 2022.

62

270.     As explained in detail above, Corizon transferred $956,707.08 to Amerisource Bergen between January 31, 2022, and February 15, 2022.  These transfers were made to satisfy obligations of PharmaCorr, which was not a subsidiary of Corizon at the time of the transfers.  The entire transfer total of $956,707.08 was made for the benefit of PharmaCorr.

271.     The Debtor commenced its bankruptcy case on February 13, 2023, less than two years after most of the transfers and no more than 26 months after the two earliest transfers.

272.     The following "badges of fraud," among other applicable badges of fraud, establish that the foregoing transfers were intended to hinder and delay the payment of the Debtor's creditors or to defraud the Debtor's creditors of any payment of their claims:  (a) all of the transfers were to insiders of the Debtor or an entity controlled by an insider of the Debtor; (b) at the time of each of the transfers there were numerous pending and threatened lawsuits against the Debtor; (c) the Debtor received no value in exchange for any of the transfers; and (d) the Debtor was insolvent or became insolvent as a result of the transfers.

273.     The transfers were fraudulent transfers under the Bankruptcy Code, the Uniform Voidable Transfers Act and other applicable state fraudulent transfer statute and should be avoided pursuant to 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544(b)(1) and state law enactments of § 4(a)(1) of the Uniform Voidable Transfers Act or other applicable state fraudulent transfer law.

274.     The transfers should be recovered pursuant to 11 U.S.C. § 550.

**COUNT V**
**Constructive Fraudulent Transfer — Avoiding Transfer to Geneva, M2 LoanCo, and PharmaCorr Pursuant to 11 U.S.C. §§ 544(b)(1), 548(a)(1)(B), 550 and Applicable State Fraudulent Transfer Law (Against Geneva, M2 LoanCo, and PharmaCorr)**

275.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

276.    As explained in detail above, Corizon transferred $5.5 million to Geneva between January 9, 2021, and May 2, 2022.

277.    As explained in detail above, Corizon transferred $24,538,155.19 to M2 LoanCo between January 29, 2021, and November 14, 2022.

278.    As explained in detail above, Corizon transferred $956,707.08 to Amerisource Bergen between January 31, 2022, and February 15, 2022.  These transfers were made to satisfy obligations of PharmaCorr, which was not a subsidiary of Corizon at the time of the transfers.  The entire transfer total of $956,707.08 was made for the benefit of PharmaCorr.

279.    The Debtor commenced its bankruptcy case on February 13, 2023, less than two years after most of the transfers and no more than 26 months after the two earliest transfers.

280.    The Debtor did not receive any value in exchange for the transfers.

281.    The Debtor was left (a) insolvent, (b) with unreasonably small capital to continue its business, or (c) without the means to pay debts it expected to incur as a result of the transfers. In addition, all of the transfers were to or for the benefit of an insider or an entity controlled by an insider of the Debtor.

282.    The transfers were fraudulent transfers under the Bankruptcy Code, the Uniform Voidable Transfers Act and other applicable state fraudulent transfer statute and should be avoided pursuant to 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b)(1) and state law enactments of § 4(a)(2) of the Uniform Voidable Transfers Act or other applicable state fraudulent transfer law.

283.    The transfers should be recovered pursuant to 11 U.S.C. § 550.

**COUNT VI**
**Aiding & Abetting Fraudulent Transfer**
**Payments to Geneva, M2 LoanCo, and PharmaCorr**
**(Against Mr. Lefkowitz and the Lefkowitz Entities)**

284. The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

285. As explained in detail above, Mr. Lefkowitz and the Lefkowitz Entities caused Mr. Lefkowitz's alter ego, Corizon, to transfer away nearly $30 million.

286. Mr. Lefkowitz and the Lefkowitz Entities caused Corizon to make $5.5 million in transfers to Geneva, an entity controlled by Perigrove 1018 and Mr. Lefkowitz.

287. Mr. Lefkowitz and the Lefkowitz Entities caused Corizon to make $24,538,155.19 in transfers to M2 LoanCo, an entity controlled by Perigrove 1018 and Mr. Lefkowitz, between January 29, 2021, and November 14, 2022.

288. Mr. Lefkowitz and the Lefkowitz Entities caused Corizon to make $956,707.08 to Amerisource Bergen between January 31, 2022, and February 15, 2022.

289. Mr. Lefkowitz and the Lefkowitz Entities enabled the fraudulent transfers to Geneva, M2 LoanCo, and Amerisource Bergen (for the benefit of PharmaCorr). Without the actions of Mr. Lefkowitz and the Lefkowitz Entities, Corizon would not have made the fraudulent transfers set forth in Counts IV and V of this Complaint.

290. As set forth above, there are viable claims for actual and constructive fraud related to the 2021-2022 transfers from Corizon to Geneva, M2 LoanCo, and Amerisource Bergen. Such transfers caused injury to the Debtor's creditors.

291. The Plaintiffs are entitled to recover damages against Mr. Lefkowitz and the Lefkowitz Entities in an amount to be determined at trial.

## COUNT VII
### Breach of Fiduciary Duty — Misappropriation of Business Opportunities
### (Against Corizon Management)

292.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

293.    In the months prior to the Divisional Merger, Corizon Management formed a company called YesCare along with several operating subsidiaries, including CHS AL, LLC, and CHS AZ, LLC, for the purpose of usurping corporate opportunities that would otherwise have gone to Corizon.  At all relevant times prior to the Divisional Merger, Corizon Management owed a fiduciary duty to Corizon.

294.    Following the Divisional Merger, Ms. Tirschwell, who was the sole shareholder of CHS TX, contributed 95% of that equity to another newly formed company called YesCare, and Corizon Management became officers or directors of YesCare.

295.    As explained in detail herein, Corizon Management diverted and exploited for their own benefit certain opportunities that should have been deemed assets of the Debtor.  Specifically, Corizon Management chose not to respond to RFPs on behalf of the Debtor, but instead on behalf of newly created entities described as "wholly owned subsidiary of: YesCare" and a "predominantly woman owned Company comprised of former Corizon clinical and administrative employees."

296.    The Debtor had a tangible expectation that the contracts would be pursued on behalf of the Debtor, as they had been throughout the Debtor's existence.

297.    The Debtor suffered damages equal to the value of the contracts that Corizon Management diverted to YesCare and the CHS Entities, leaving the Debtor without funds with which to pay its creditors.

66

298.    Corizon Management's motive in diverting business opportunities away from the Debtor, knowingly depriving creditors of potential courses of payment, is sufficient to warrant an award of punitive damages.

299.    The Plaintiffs are entitled to recover damages against Corizon Management for misappropriating business opportunities in an amount to be determined at trial.

**COUNT VIII**
**Breach of Fiduciary Duty**
**(Against Mr. Lefkowitz)**

300.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

301.    As a director and/or officer of Corizon, Mr. Lefkowitz owed fiduciary duties of care, loyalty, and good faith to Corizon.  Those fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of Corizon's business, to discharge his actions in good faith, to act in the best interests of Corizon and its creditors upon Corizon becoming insolvent, and to put the interests of Corizon and its creditors before his own.

302.    Mr. Lefkowitz breached his fiduciary duties of care, loyalty, and good faith, and acted with gross negligence and recklessness, for the reasons alleged herein, including, among other things:

      a.    knowingly and intentionally funneling business opportunities away from Corizon and toward other entities in a disloyal manner;

      b.    acting with intent to violate applicable law;

      c.    acting in intentional dereliction of duty;

      d.    taking steps to protect and further his own interests and other entities' interests over Corizon's best interests;

e.    taking steps to protect and further his own interests and other entities' interests over Corizon's creditors' best interests while Corizon was insolvent;

f.    taking steps to protect and further the Lefkowitz Entities' interests over Corizon's best interests;

g.    taking steps to protect and further the Lefkowitz Entities' interests over Corizon's creditors' interests while Corizon was insolvent;

h.    failing to investigate and inform himself of the medical malpractice issues plaguing Corizon and causing grievous injuries to Corizon's patients;

i.    intentionally failing to act in the face of a known duty to act;

j.    causing the negative effects on Corizon and its liabilities by delaying to act and failing to act in the face of mounting medical malpractice liabilities;

k.    failing to adequately respond to and address longstanding medical malpractice issues;

l.    failing to promptly undertake corrective actions;

m.    diluting assets once insolvency and bankruptcy became inevitable;

n.    engaging in a reckless and grossly negligent waste of corporate assets;

o.    taking actions designed to benefit himself at the expense of Corizon; and

p.    mismanaging Corizon.

303.    In taking the foregoing actions and/or failing to take such actions, Mr. Lefkowitz consistently failed to inform himself to the degree reasonably necessary about the transactions at issue and the impact of such transactions on Corizon.

68

304.    Mr. Lefkowitz consistently failed to exercise reasonable business judgment in approving the foregoing actions and/or inactions.

305.    The Plaintiffs are entitled to recover damages against Mr. Lefkowitz, in an amount to be determined at trial.

## COUNT IX
### Breach of Fiduciary Duty
### (Against Corizon Management)

306.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

307.    As directors and/or officers of Corizon, the individual defendants owed fiduciary duties of care, loyalty, and good faith to Corizon.  Those fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of Corizon's business, to discharge their actions in good faith, to act in the best interests of Corizon and its creditors upon Corizon becoming insolvent, and to put the interests of Corizon and its creditors before their own.

308.    Corizon Management breached their fiduciary duties of care, loyalty, and good faith, and acted with gross negligence and recklessness, for the reasons alleged herein, including, among other things:

      a.    knowingly and intentionally funneling business opportunities away from Corizon and toward other entities in a disloyal manner;

      b.    acting with intent to violate applicable law;

      c.    acting in intentional dereliction of duty;

      d.    taking steps to protect and further their own interests, Mr. Lefkowitz's interests, and other entities' interests over Corizon's best interests;

69

e.   taking steps to protect and further their own interests, Mr. Lefkowitz's interests, and other entities' interests over Corizon's creditors' best interests while Corizon was insolvent;

f.   taking steps to protect and further the Lefkowitz Entities' interests over Corizon's best interests;

g.   taking steps to protect and further the Lefkowitz Entities' interests over Corizon's creditors' interests while Corizon was insolvent;

h.   failing to investigate and inform themselves of the medical malpractice issues plaguing Corizon and causing grievous injuries to Corizon's patients;

i.   intentionally failing to act in the face of a known duty to act;

j.   causing the negative effects on Corizon and its liabilities by delaying to act and failing to act in the face of mounting medical malpractice liabilities;

k.   failing to adequately respond to and address longstanding medical malpractice issues;

l.   failing to promptly undertake corrective actions;

m.   diluting assets once insolvency and bankruptcy became inevitable;

n.   abdicating their decision-making authority to Mr. Lefkowitz;

o.   engaging in a reckless and grossly negligent waste of corporate assets;

p.   taking actions designed to benefit Mr. Lefkowitz at the expense of Corizon; and

q.   mismanaging Corizon.

70

309.     In taking the foregoing actions and/or failing to take such actions, Corizon Management consistently failed to inform themselves to the degree reasonably necessary about the transactions at issue and the impact of such transactions on Corizon.

310.     Corizon Management consistently failed to exercise reasonable business judgment in approving the foregoing actions and/or inactions.

311.     The Plaintiffs are entitled to recover damages against Corizon Management, in an amount to be determined at trial.

**COUNT X**
**Breach of Fiduciary Duty—Red Flags**
**(Against Corizon Management)**

312.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

313.     As directors and/or officers of Corizon, each of Corizon Management owes fiduciary duties of care, loyalty, and good faith to Corizon and to Corizon's creditors to the extent that Corizon became insolvent.  Those fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of Corizon's business, to discharge their actions in good faith, to act in the best interests of Corizon and its creditors upon Corizon becoming insolvent, and to put the interests of Corizon and its creditors before their own.

314.     Corizon Management breached their fiduciary duties of care, loyalty, and good faith, and acted with gross negligence and recklessness, for the reasons alleged herein, including, among other things, by ignoring and/or not taking prudent actions in the face of red flags, among other things:

> a.      causing Corizon to proceed with the divisional merger after learning of concerns with the Signature Accounts;

71

b.     failing to timely take action concerning the Signature Accounts upon learning that only Mr. Lefkowitz could access that account;

c.     failing to investigate and inform themselves of the medical malpractice issues with Corizon's business, such as ignoring red flag warnings concerning medical malpractice liabilities;

d.     causing the negative effects on Corizon and its liabilities by delaying addressing Corizon's medical malpractice problems;

e.     failing to adequately respond to and address longstanding medical malpractice issues; and

f.     failing to promptly undertake corrective actions.

315.   In taking the foregoing actions and/or failing to take such actions, Corizon Management consistently failed to inform themselves to the degree reasonably necessary about the transactions at issue and the impact of such transactions on Corizon, and on Corizon's creditors, once Corizon was insolvent.

316.   Corizon Management consistently failed to exercise reasonable business judgment in approving the divisional merger and/or inactions.

317.   The Plaintiffs are entitled to recover damages against Corizon Management for ignoring and/or not taking prudent actions in the face of red flags in an amount to be determined at trial.

## COUNT XI
### Alter Ego
### (Against Mr. Lefkowitz)

318.   The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

319. As discussed in detail above, Mr. Lefkowitz directly, and indirectly through entities that he controls, exercised domination and control over Corizon through, among other things:

    a.    failing to keep corporate formalities;

    b.    designing a bankruptcy strategy for the Chapter 11 Case designed to provide Mr. Lefkowitz and the Lefkowitz Entities with a cheap release;

    c.    controlling Corizon's decision-making and strategy formally through board and officer positions as well as informally;

    d.    routinely failing to observe corporate formalities, resulting in intermingling of business activity, assets, and management.

320. Mr. Lefkowitz used his domination and control of Corizon to perpetrate a fraud that formed the basis for the Divisional Merger that ultimately led to the Chapter 11 Case.

321. As alleged herein, Mr. Lefkowitz's fraudulent, improper, and illegal use of Corizon's corporate form caused millions of dollars in damages and other injuries, including those liabilities that were assumed by the Trusts under the Plan.

322. Failure to disregard Corizon's forms and pierce the veil shielding Mr. Lefkowitz from liability for his actions would be fundamentally unfair to the Trusts' beneficiaries.

323. Holding Mr. Lefkowitz liable for his actions in, among other things, dominating and controlling Corizon is necessary to avoid injustice to the Trusts' beneficiaries.

324. Plaintiffs are entitled to a judgment against Mr. Lefkowitz in an amount to be determined at trial.

## COUNT XII
### Veil Piercing
### (Against Perigrove, LLC)

325. The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

326.    Perigrove 1018 exercised complete domination of Corizon with respect to all transactions that give rise to the causes of action described in this Complaint.

327.    Failing to disregard Corizon's separate form and pierce the veil shielding Perigrove 1018 from liability for its actions would be fundamentally unfair to Corizon's creditors.

328.    Perigrove 1018 and entities that it controlled routinely failed to observe corporate formalities in matters involving Corizon, resulting in an intermingling of business activity, assets, and management.

329.    Holding Perigrove 1018 liable for its actions in directing and controlling Corizon is necessary to avoid injustice to Corizon's creditors.

330.    Plaintiffs are entitled to a judgment against Perigrove 1018 in an amount to be determined at trial.

## COUNT XIII
### Successor Liability
### (Against YesCare Corp.)

331.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

332.    YesCare was formed as an initial step in the restructuring scheme that culminated in the Divisional Merger.  YesCare was created to take over Corizon's viable business.

333.    Corizon Management pushed new contracts to newly formed YesCare subsidiaries and, through the Divisional Merger, allocated substantially all current contracts to CHS TX, which became a YesCare subsidiary.

334.    Following the Divisional Merger, YesCare operated as a mere continuation of Corizon.   YesCare continued to operate the business once operated by Corizon without interruption.  YesCare and CHS TX occupied the same principal place of business as Corizon at 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

335.	There was a continuity of management.  Following the Divisional Merger, in May of 2022, (a) Sara Tirschwell, the former Chief Executive Officer for Corizon, became the Chief Executive Officer for YesCare, (b) Ayodeji Olawale Ladele, the former Executive Vice President and Chief Medical Officer for Corizon, became the Executive Vice President and Chief Medical Officer for YesCare, (c) Beverly Michelle Rice, the former Corporate Controller for Corizon, became the Corporate Controller for YesCare, (d) Jeffrey Scott King, the former Chief Legal Officer at Corizon, became the Executive Vice President and Chief Legal Officer at YesCare, (e) Jennifer Lynne Finger, the former Assistant General Counsel at Corizon, became the Assistant General Counsel at YesCare, and (f) Frank Jeffrey Sholey, the former Chief Financial Officer at Corizon, became the Chief Financial Officer at YesCare, and later assumed the role of Chief Executive Officer for YesCare in February of 2023.

336.	There was a continuity of personnel.  All employees who worked for Corizon prior to the Divisional Merger became employees of YesCare and/or CHS TX.

337.	There was no change to the operating assets or general business operations.  There was no change to postage and packing or contract structures.  To ensure YesCare continued to receive payments under the existing contracts, YesCare continued to use the same bank accounts as Corizon.  The operations of YesCare were virtually identical to those of Corizon prior to the mergers and the separation of assets from liabilities.

338.	There was a continuity of shareholders.  Perigrove 1018 was the beneficial owner of Corizon prior to the Divisional Merger and became the beneficial owner of YesCare after the Divisional Merger.  At all relevant times prior to the Divisional Merger, Isaac Lefkowitz controlled the operations of Corizon, and at all relevant times after the Divisional Merger, Isaac Lefkowitz controlled the operations of YesCare.

339. After the Divisional Merger, Tehum commenced a bankruptcy proceeding to liquidate its remaining assets. At the time Tehum declared bankruptcy, it had no employees or ordinary business operations. Upon information and belief, the transactions that resulted in YesCare operating as a mere continuation of Corizon were done with the specific intent of hindering, delaying, and defrauding Corizon's creditors, including the tort claimants.

340. The creation of YesCare and its subsidiaries was specifically intended to facilitate the fraudulent transactions described in the Complaint.

341. Holding YesCare liable for Corizon's liability to its creditors is necessary to avoid fraud perpetrated on and injustice to Corizon's creditors.

342. Plaintiffs are entitled to a judgment against YesCare in an amount to be determined at trial.

## COUNT XIV
### Successor Liability
### (Against CHS TX, LLC)

343. The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

344. CHS TX was formed through the Divisional Merger. CHS TX was allocated all of Corizon's income-producing assets, including substantially all current contracts.

345. CHS TX's business is a mere continuation of Corizon's former business, ultimately directed by the same management and key decision makers as Corizon.

346. The creation of CHX TX was specifically planned to carry out the fraudulent transactions described in the Complaint.

347. Holding CHS TX liable for Corizon's liability to its creditors is necessary to avoid fraud perpetrated on and injustice to Corizon's creditors.

76

348.    Plaintiffs are entitled to a judgment against CHS TX in an amount to be determined at trial.

## COUNT XV
### Breach of Contract
### (Against the Settlement Parties)

349.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

350.    As explained in detail above, as of February 1, 2026, the Settlement Parties entered into the Cure Agreement pursuant to which they each agreed to pay to the Trusts the Additional Cure Payments (as such term is defined in the Cure Agreement) to address the Past Due Amount of money owed by the Settlement Parties to the Trusts pursuant to the Plan.

351.    The Settlement Parties then failed to make the Additional Cure Payments, in breach of their obligations under the Cure Agreement and in contravention of their obligations under the Plan.

352.    The Plaintiffs are entitled to damages in the amount of the full Settlement Payment owed under the Plan and the Cure Agreement.

## COUNT XVI
### Attorney's Fees and Costs
### (Against All Defendants)

353.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

354.    To the extent allowable by applicable law, the Plaintiffs request that the Court award reasonable attorneys' fees and costs.

## RESERVATION OF RIGHTS

355.    The Plaintiffs reserve all rights to amend this Complaint as new facts develop or are discovered.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs request that the Court grant the following relief:

### On Count I:

(1)     judgment that the Divisional Merger constitutes an actual fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

(2)     avoiding the Divisional Merger pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

(3)     judgment that the Divisional Merger constitutes an actual fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(4)     avoiding the Divisional Merger pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

(5)     preserving the avoided obligation for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

### On Count II:

(1)     judgment that the Divisional Merger constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B);

(2)     avoiding the Divisional Merger pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

(3)     judgment that the Divisional Merger constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(4)     avoiding the Divisional Merger pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

(5)     preserving the avoided obligation for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

**On Count III:**   judgment declaring that Mr. Lefkowitz, Ms. Tirschwell, and Mr. King aided and abetted a fraudulent Divisional Merger, and awarding damages in an amount to be determined at trial.

78

**On Count IV:**

(1)     judgment that the $5.5 million in transfers to Geneva between January 9, 2021, and May 2, 2022, constitute an actual fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

(2)     avoiding the $5.5 million in transfers to Geneva between January 9, 2021, and May 2, 2022, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

(3)     judgment that the $5.5 million in transfers to Geneva between January 9, 2021, and May 2, 2022, constitutes an actual fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(4)     avoiding the $5.5 million in transfers to Geneva between January 9, 2021, and May 2, 2022, pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(5)     judgment that the $24,538,155.19 in transfers to M2 LoanCo between January 29, 2021, and November 14, 2022, constitute an actual fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

(6)     avoiding the $24,538,155.19 in transfers to M2 LoanCo between January 29, 2021, and November 14, 2022, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

(7)     judgment that the $24,538,155.19 in transfers to M2 LoanCo between January 29, 2021, and November 14, 2022, constitute an actual fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(8)     avoiding the $24,538,155.19 in transfers to M2 LoanCo between January 29, 2021, and November 14, 2022, pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(9)     judgment that the $956,707.08 in transfers to Amerisource Bergen between January 31, 2022, and February 15, 2022, constitute an actual fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

(10)     avoiding the $956,707.08 in transfers to Amerisource Bergen between January 31, 2022, and February 15, 2022, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

(11)     judgment that the $956,707.08 in transfers to Amerisource Bergen between January 31, 2022, and February 15, 2022, constitute an actual fraudulent

79

transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(12)     avoiding the $956,707.08 in transfers to Amerisource Bergen between January 31, 2022, and February 15, 2022, pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

(13)     preserving the avoided transfers for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

**On Count V:**

(1)     judgment that the $5.5 million in transfers to Geneva between January 9, 2021, and May 2, 2022, constitute a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

(2)     avoiding the $5.5 million in transfers to Geneva between January 9, 2021, and May 2, 2022, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

(3)     judgment that the $5.5 million in transfers to Geneva between January 9, 2021, and May 2, 2022, constitute a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(4)     avoiding the $5.5 million in transfers to Geneva between January 9, 2021, and May 2, 2022, pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(5)     judgment that the $24,538,155.19 in transfers to M2 LoanCo between January 29, 2021, and November 14, 2022, constitute a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

(6)     avoiding the $24,538,155.19 in transfers to M2 LoanCo between January 29, 2021, and November 14, 2022, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

(7)     judgment that the $24,538,155.19 in transfers to M2 LoanCo between January 29, 2021, and November 14, 2022, constitute a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(8)     avoiding the $24,538,155.19 in transfers to M2 LoanCo between January 29, 2021, and November 14, 2022, pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

80

(9)    judgment that the $956,707.08 in transfers to Amerisource Bergen between January 31, 2022, and February 15, 2022, constitute a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

(10)    avoiding the $956,707.08 in transfers to Amerisource Bergen between January 31, 2022, and February 15, 2022, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

(11)    judgment that the $956,707.08 in transfers to Amerisource Bergen between January 31, 2022, and February 15, 2022, constitute a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

(12)    avoiding the $956,707.08 in transfers to Amerisource Bergen between January 31, 2022, and February 15, 2022, pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

(13)    preserving the avoided transfers for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

**On Count VI:** judgment that Mr. Lefkowitz and the Lefkowitz Entities aided and abetted the fraudulent transfer of nearly $30 million, and awarding damages in an amount to be determined at trial;

**On Count VII:** judgment that Corizon Management breached their respective fiduciary duties to Corizon when they misappropriated business opportunities, and awarding damages in an amount to be determined at trial;

**On Count VIII:** judgment that Mr. Lefkowitz breached his fiduciary duties to Corizon and Corizon's creditors once Corizon became insolvent, and awarding damages in an amount to be determined at trial;

**On Count IX:** judgment that Corizon Management breached their respective fiduciary duties to Corizon and Corizon's creditors once the Debtor became insolvent, and awarding damages in an amount to be determined at trial;

81

**On Count X:**  judgment that Corizon Management breached their respective fiduciary duties to Corizon and Corizon's creditors once the Debtor became insolvent, and awarding damages in an amount to be determined at trial;

**On Count XI:**  judgment that Corizon is the alter ego of Mr. Lefkowitz, that Mr. Lefkowitz is obligated to pay all claims asserted by the Trusts' beneficiaries against the Trusts, and awarding damages in an amount to be determined at trial;

**On Count XII:**  judgment that Perigrove 1018's veil should be pierced to allow the Plaintiffs to hold Perigrove 1018 responsible for all claims asserted by the Trusts' beneficiaries against the Trusts, and awarding damages in an amount to be determined at trial;

**On Count XIII:**  judgment that YesCare is liable under the doctrine of successor liability, that YesCare is responsible for all claims asserted by the Trusts' beneficiaries against the Trusts, and awarding damages in an amount to be determined at trial;

**On Count XIV:**  judgment that CHS TX is liable under the doctrine of successor liability, that CHS TX is responsible for all claims asserted by the Trusts' beneficiaries against the Trusts, and awarding damages in an amount to be determined at trial;

**On Count XV:**  judgment that the Settlement Parties breached their obligations under the Plan and the Cure Agreement, and awarding damages in an amount to be determined at trial; and

**On Count XVI:**  judgment awarding attorney's fees and costs; and awarding such other and further relief as this Court may deem just and proper.

Dated:  April 27, 2026

Respectfully submitted,

**BROWN RUDNICK LLP**

/s/ *Eric R. Goodman*

Eric R. Goodman (*pro hac vice*)
D. Cameron Moxley (*pro hac vice*)
Gerard T. Cicero (*pro hac vice*)
Susan Sieger-Grimm (*pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email: egoodman@brownrudnick.com
      cmoxley@brownrudnick.com
      gcicero@brownrudnick.com
      ssiegergrimm@brownrudnick.com

**STINSON LLP**

/s/ *Nicholas Zluticky*

Nicholas Zluticky (SDTX Bar No. 3845893)
Zachary H. Hemenway (SDTX Bar No. 3856801)
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Email:  nicholas.zluticky@stinson.com
      zachary.hemenway@stinson.com

*Counsel for the PI/WD Trustee and the GUC Trustee*

83